**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

No. 01-10267
_____

UNITED STATES of AMERICA,

                                        Plaintiff-Appellee,

                    versus

JONATHAN STEVEN LONDONO,

                                        Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Texas
_____

March 6, 2002

Before KING, Chief Judge, and REAVLEY, and WIENER, Circuit
Judges.

PER CURIAM:

     Defendant-Appellant Jonathan Steven Londono pleaded guilty to
theft of an interstate shipment — diamonds, in this instance — in
violation of 18 U.S.C. § 659.  He appeals his sentence, contesting
several aspects of the district court's sentencing methodology as
well as (1) the court's imposition of a sentence consecutive to his
state sentence, (2) the inclusion of a California conviction for a
crime committed as a juvenile in computing his Criminal History
Category ("CHC"), and his being returned to state custody.
Concluding that the court erred reversibly in enhancing Londono's

sentence under United States Sentencing Guideline (U.S.S.G.) § 2B1.1(b)(2) for theft from the person of another, we vacate and remand the case for resentencing consistent with this opinion.

## I. FACTS AND PROCEEDINGS

The undisputed facts underlying Londono's crime of conviction are were summarized in the factual resume submitted with the plea agreement:

1. At approximately 4:20 p.m. on Wednesday April 14, 1999, Zvi Ben-Yosef, a diamond salesman for A. Schartz & Sons, Israel[,] was transporting $550,000 worth of loose diamonds from Dallas-Fort Worth International Airport, Texas (DFW) to San Francisco, California....Ben-Yosef placed his black leather "carry-on" case containing the diamonds (as well as Ben-Josef's [sic] passport and airline tickets) on the x-ray belt at the...security checkpoint. As Ben-Yosef started through the magnetometer, a Hispanic female (later identified as Maria Elvia Charry) stepped in front of him and dropped her wallet. Charry blocked Ben-Yosef while Edwin Gomez picked up Ben-Yosef's bag containing the diamonds and walked out of the secured area of the airport through the adjacent exit doors. Defendant, JONATHON STEVEN LONDONO served as a look out for Gomez, and had stood next to Gomez as Gomez stole Ben-Yosef's bag. Gomez, LONDONO, and Charry took the diamond laden case from the airport and transported it to a location outside the airport. The stolen diamonds were transported out of the state of Texas by LONDONO, Charry, and Gomez.

2. The theft of the loose diamonds from Ben-Yosef was planned to by [sic] Charry, LONDONO, and Gomez in advance of Ben-Yosef's arrival at the security checkpoint at the DFW airport.

During the sentencing hearing, the district court heard testimony from Agent Steven Sumner of the FBI regarding the manner in which the theft took place, including in particular whether the

2

diamonds were stolen from "the person of Ben-Yosef." Sumner testified that, to the extent Ben-Yosef could do so and still comply with airport security procedures and regulations, he did his best to maintain direct contact with and control over his carry-on case that contained the diamonds. Pursuant to the customary practice of gem dealers, Ben-Yosef attempted to walk through the magnetometer parallel to and in lock-step with the diamond case while it was passing through the x-ray machine on a conveyor belt, so that he would be separated from the case for the minimum possible time and distance. Sumner testified that, but for interference by Londono's accomplice, Ben-Yosef would have remained in very close proximity to the case and would have recovered it immediately at the output end of the x-ray machine. Because he was brought to a stand-still by the tactics of the accomplice, however, Ben-Yosef was approximately ten feet from the case at the time it was stolen, a distance described by Sumner as being "within a leap and a grab."

Londono had committed a murder in February, 1999. In the month following his April theft of the diamonds, Londono was arrested for the murder by Texas authorities, who had been tipped off by an informant that Londono was involved in the diamond theft as well as the homicide. Londono pleaded guilty to murder in Texas state court and received a ten year prison sentence. Pursuant to a writ of habeas corpus ad prosequendum, Londono was then delivered into federal custody to answer for his theft of the diamonds.

After Londono pleaded guilty to the federal theft charge, a Presentence Investigation Report (PSR) was prepared in which the probation officer recommended that (1) Londono's base offense level of four for theft be increased by 12 levels based on the value of the stolen diamonds; (2) two more levels be added because the offense involved more than minimal planning;[1] and (3) an additional two levels be added because the theft was from the person of another.  The PSR then recommended reduction of Londono's offense level by two for acceptance of responsibility.  The result was a recommended offense level of 18.

Londono's criminal history points summed to eight, placing him in the CHC of IV.  His CHC was based in part on a California conviction for commission of a crime for which Londono had been arrested when he was sixteen years old.

Londono filed objections to the PSR, challenging (1) the two-level enhancement for theft from the person of another, (2) the inclusion of the California conviction in determining his CHC, (3) any decision the district court might make to cause his federal sentence to run consecutively to, rather than concurrently with, the state sentence that he was then serving in Texas, and (4) any decision by the court to return him to state custody instead of retaining him in federal custody.

---

[1]    The enhancement for more than minimal planning, then U.S.S.G. § 2B1.1(b)(4), has now been removed from the Guidelines pursuant to a November 2001 amendment.  See U.S.S.G. Appendix C, Amendment 617.

In an addendum to the PSR, the probation officer maintained that the two-level enhancement for theft from the person of another applied, noting that co-defendant Gomez had received the same enhancement. As for the California conviction, the probation officer acknowledged that the conviction should have been placed under the juvenile adjudications section, rather than under adult criminal convictions, but pointed out that the results would be the same either way because the Sentencing Guidelines call for inclusion of that conviction in Londono's CHC calculation anyway. Finally, the addendum deferred to the district court's discretion regarding the issues of consecutive sentencing and return to state custody.

During the sentencing hearing (which was held, of course, after the filing of the PSR, Londono's objections, and the addendum), counsel for Londono reiterated the same objections that he had made in response to the PSR. The district court overruled all objections and, after discussing each with counsel, sentenced Londono to a 50 month term of imprisonment, (close to the top of the calculated guideline range of 41 to 51 months). The court specified that the federal sentence would run consecutively to the unserved balance of Londono's state imprisonment. Londono timely appealed.

## II. ANALYSIS

### A. __Theft from the Person of Another__

A district court's factual findings during sentencing must be supported by a preponderance of the evidence; they are reviewed for clear error.[2] Although we have yet to decide if theft from the person of another presents a question of law or fact, the Eighth Circuit, in United States v. Jankowski,[3] held it to be a factual determination reviewed for clear error. Discerning no reason to disagree with the Eighth Circuit's analysis, we adopt that court's approach.

Londono contends that the district court's application of § 2B1.1(b)(2)[4] is clear error because, at the time that the diamond case was snatched, it was neither being held by Ben-Yosef nor within his reach. Application Note 1 to § 2B1.1 states in relevant part:

> "Theft from the person of another" means theft, without the use of force, of property that was being held by another person or was within arms' reach. Examples include pick-pocketing and non-forcible purse-snatching, such as the theft of a purse from a shopping cart.[5]

The background comment to § 2B1.1 teaches that theft from the person of another receives enhancement "because of the increased

---

[2] United States v. Nevels, 160 F.3d 226, 229 (5th Cir. 1998) (determining that district court's finding that the theft was from the person of another was not clearly erroneous).

[3] 194 F.3d 878, 885 (8th Cir. 1999).

[4] At the time Londono was sentenced, § 2B1.1(b)(2) was the "theft from the person of another" enhancement provision. In the November 2001 amendments, that provision was moved to § 2B1.1(b)(3). U.S.S.G. Appendix C, Amendment 617.

[5] U.S.S.G. § 2B1.1, n. 1 (emphasis added).

risk of physical injury" presented to the theft victim. Thus, the announced purpose of this enhancement is to dissuade and punish the kind of direct or near-direct physical interplay between the perpetrator and the victim that has the potential of leading to the injury or even the death of the victim. As with all criminal statutes and rules, we must construe this sentencing provision strictly and in the defendant's favor.[6]

Here, the facts establish that Ben-Yosef was approximately ten feet away from the diamond case at the moment of its theft. In addition to linear separation, at least three impediments separated Ben-Yosef from his property: Charry, the accomplice; the magnetometer; and the x-ray machine.[7] These facts alone are sufficient to demonstrate that the diamonds were not "within arms' reach" of Ben-Yosef when they were stolen. Although there was a at least a possibility that he might have created a risk of injury by pursuing the bag-snatcher, Gomez, if Ben-Yosef had observed Gomez in the act, the risk contemplated by the background comment is not of that type. Were it that extensive, the Guideline definition of "arms' reach" would be rendered meaningless; no matter how attenuated the victim might be from the property, there is always

---

[6] United States v. Haga, 821 F.2d 1036, 1038 (5th Cir. 1987).

[7] Although Gomez, not Londono, actually snatched the carry-on bag, "a defendant who is part of a jointly undertaken criminal activity is accountable for all reasonably foreseeable acts...of others in furtherance of the...activity." Nevels, 160 F.3d at 229 (citations and internal quotations omitted).

7

some possibility that, after the property is taken, the victim will create a risk to himself by chasing or tracking down the thief. The risk of injury contemplated by the subject guideline, however, must result from a virtually contiguous, physical and temporal interaction between victim and thief. The most attenuated example of "theft from the person of another" provided in the guideline commentary is that of theft of a purse from a shopping cart, clearly an "arms' reach" situation. The instant situation is easily distinguishable from that of a person who for convenience places her purse in a shopping cart and stays within arms' reach of the cart and the purse.

The familiar situation of the commercial airline passenger being separated from his bag when negotiating a security checkpoint is likewise distinguished from the shopping cart. Despite a traveler's best efforts, at the moment his bag starts through the x-ray conveyer and he starts through the magnetometer, his visual, temporal, and spatial connection with his carry-on items is lost. In addition, a number of frequently occurring events beyond the traveler's control — such as setting off the magnetometer or being subjected to a random security "wanding," not to mention the same kind of delays being experienced by passengers in line ahead of the victim — further separate the traveler from his bag.

In addition to explicitly requiring the victim's spatial proximity to the purloined article, the guideline provision and the commentary implicitly require that the victim be aware of the

8

theft. Without awareness, the potential for victim injury, which is the gravamen of this sentence enahancement, does not exist. In the Ben-Yosef incident, his visual contact with, and physical accessibility to, the diamond case were terminated momentarily by the security procedure, eliminating the risk of personal danger contemplated by the guideline.

Although no controlling precedent guides our analysis here, the Eighth Circuit's reasoning in Jankowski is persuasive. There, the proximity of an armored car driver who was present in the driver's seat of the vehicle during the theft of federal security deposits from the rear compartment, was held to be too attenuated from the stolen goods to trigger the § 2B1.1(b)(2) enhancement.[8] The driver was neither holding the security deposits nor within arms' reach of them when they were taken. In addition to his linear distance from the deposits, the driver's ability to reach them was prevented by the presence of a bulkhead with a plexiglass barrier located between him and the deposits at all relevant times. We find this situation indistinguishable from that of Ben-Yosef, who could not possibly have reached his case with an outstretched arm and whose ten-foot separation from the diamonds was further impeded by the presence of at least one person (Charry), a magnetometer, and an x-ray machine.

The district court's finding in this instance is

---

[8] Jankowski, 194 F3d at 885-86.

irreconcilable with the plain wording of § 2B1.1(b)(2) and the accompanying notes. Regardless whether we treat the district court's ruling as a matter of law and review it de novo or as a factual determination and review it for clear error, we are left with the distinct impression that it is wrong, leaving us no alternative but to vacate Londono's sentence and remand this matter for resentencing without including a two-level increase for theft from the person of another.

## B. **Inclusion of the California Conviction in CHC Calculation**

Londono challenges the use of a California conviction as a juvenile in the calculation of his CHC. He insists that the government failed to offer reliable evidence to show that his California conviction was valid. The record evidence demonstrating the validity of the conviction is its presence in the PSR and the probation officer's testimony that she gathered information about the conviction from a Texas "rap sheet" on Londono. He counters that an unverified adult rap sheet is not the proper place for a juvenile conviction to appear. Although somewhat unclear, Londono's argument appears to be that the PSR on which the district court relied contained information extracted from an unreliable source — namely, the adult rap sheet.

As a defendant challenging the findings of the PSR, Londono bears the burden of showing that the information in the PSR "cannot be relied on because it is materially untrue, inaccurate, or

unreliable."[9]  In general, the PSR bears "sufficient indicia of reliability to be considered as evidence" by the district court, "especially when there is no evidence in rebuttal."[10]

Londono does not argue that the California conviction was not valid or legitimate, or that it was materially untrue.  He contends, instead, that the court cannot use the juvenile conviction because its only source appears to have been an unverified adult rap sheet.  He reasons that the district court cannot include the conviction in the CHC calculation because the evidence of its having been a juvenile court conviction — the vague testimony of the probation officer regarding another state's "rap" sheet — is unreliable and therefore insufficient to justify inclusion.  Londono did not, however, adduce evidence or present support from California penal law to bolster his bald assertion of unreliability.  Noting that many states have provisions for trying juveniles as adults and that no evidence had been adduced to demonstrate the invalidity or inapplicability of the conviction, the court overruled Londono's objection.

We agree with the court's ruling on this point. Londono has failed to carry his burden of showing unreliability; in fact, he has produced nothing other than his conclusional contention to cast doubt on the PSR's findings.  Under these circumstances, the

---

[9]  United States v. Angulo, 927 F.2d 202, 205 (5th Cir. 1991).

[10]  United States v. Hornsby, 88 F.3d 336, 339 (5th Cir. 1996).

11

district court was justified in relying on the PSR in calculating Londono's CHC.

## C.  **Consecutive versus Concurrent Sentences**

We review for abuse of discretion a district court's decision to make a federal sentence run consecutively to a state sentence.[11] At sentencing, counsel for Londono first argued that the case fell under Guideline § 5G1.3(b) which requires imposition of concurrent sentences.  When the court ruled that Londono's case falls under § 5G1.3(c), making the decision discretionary, defense counsel urged the trial court to make the federal sentence run concurrently to Londono's state sentence  because of his young age and the 10-year length of the state sentence.

On appeal, though, Londono takes an entirely different approach, arguing that the trial court erred by not adequately considering the sentencing factors detailed in 18 U.S.C. § 3553 when making the choice between consecutive or concurrent sentencing.  As Londono never raised this objection in the district court, however, our review is for plain error only.[12]  Under this standard, the error (1) must be clear or obvious, (2) must affect the defendant's substantial rights, and (3) seriously affects the

---

[11]  United States v. Richardson, 87 F.3d 706, 709 (5th Cir. 1996).

[12]  United States v. Izaguirre-Losoya, 219 F.3d 437, 441 (5th Cir. 2000) ("The defendant, however, did not object to the district court's failure to explain the reason for its imposition of the sentence as required under § 3553(c). Thus, our review is for plain error only.").

fairness, integrity, or public reputation of the proceedings.[13]

The backdrop against which the district court imposed a consecutive sentence reflects that at the time of his federal proceedings, Londono had pled guilty to a murder charge in Texas state court and was serving the undischarged balance of his 10-year prison sentence there. He was brought to federal court from the state prison pursuant to a valid writ of <u>habeas corpus ad prosequendum</u> for the limited purpose of answering for his role in the theft of the diamonds.[14]

The court's decision to make Londono's newly imposed federal sentence run consecutively to his previously imposed and as yet undischarged state term of imprisonment is governed by U.S.S.G. § 5G1.3(c). Application Note 3 to § 5G1.3 requires the court to consider the factors set forth in 18 U.S.C. § 3584. Section 3584 directs the court to consider the factors detailed in 18 U.S.C. § 3553(a), which lists seven categories of concern, together with accompanying subcategories, that a district court must take into account when imposing a sentence. Section 3553(c) mandates that, at the time of sentencing, the court "<u>shall</u> state in open court the reasons for its imposition of the particular sentence...." (emphasis added).

---

[13] <u>Id.</u> (citations and internal quotations omitted)

[14] After the district court imposed its sentence to run consecutively instead of concurrently, he was returned to state custody, as expressly required by that writ, to serve the remainder of his state term before commencing to serve his federal sentence.

13

True, the district court did not expressly mention either § 3584 or § 3553(a); it did, however, enter into an extensive dialogue with defense counsel about the applicability of § 5G1.3(c), and it entertained all of counsel's arguments regarding the relevant sentencing factors. In addition, after the court's colloquy with defense counsel and the prosecutor, and before the court denied Londono's request for a concurrent sentence, it noted that (1) the state murder charge was unrelated, (2) the defendant appeared to have been on a crime spree, and (3) the instant offense involved considerable money and planning.

We have previously held that the district court need not rotely mention each of the factors in § 3553(a), or the statute itself for that matter, to be in compliance with the dictates of § 3553(c).[15] In fact, the proceedings in district court need only "imply consideration of the § 3553(a) factors."[16] Here, the district court's protracted discussion of § 5G1.3 and its explanation of some of the factors underpinning its decision to make Londono's sentence run consecutively to his state sentence evinces consideration of § 3553(a). In the context of our extremely deferential standard of review of the sentencer's election between consecutive or concurrent sentences, Londono has failed to show plain error in the district court's ruling on this

---

[15]   Richardson, 87 F.3d at 711.

[16]   Izaguirre-Losoya, 219 F.3d at 440.

point.

**D.  Return to State Custody**

Londono also contends that the district court erred when it returned him to state custody following the federal proceedings. Londono's argument fails.  According to <u>Causey v. Civiletti</u>:

> The law is clear in this Circuit that, if a defendant is in state custody and he is turned over to federal officials for federal prosecution, the state government's loss of jurisdiction is only temporary.  The prisoner will be returned to state custody at the completion of the federal proceedings or the federal sentence if the federal government wishes to execute it immediately.  A writ of habeas corpus ad prosequendum is only a "loan" of the prisoner to another jurisdiction for criminal proceedings in the receiving jurisdiction.[17]

Moreover, having violated both federal and state criminal laws, Londono "may not complain of the order in which he is tried or punished for such offenses."[18]  Again, the writ of <u>habeas</u> <u>corpus</u> <u>ad prosequendum</u> pursuant to which Londono was brought to the district court expressly required that he be returned to state custody after the federal proceedings were completed.  The district court's decision to return Londono to state custody is free of error.

### III. CONCLUSION

For the foregoing reasons, Londono's sentence is vacated and remanded for the sole purpose of resentencing without including an enhancement under § 2B1.1(b)(2).

---

[17]  621 F.2d 691, 693 (5th Cir. 1980)

[18]  <u>Id.</u> at 694 (citations and internal quotations omitted).

VACATED and REMANDED for resentencing.