# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

_____

m 01-30743

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

DAVID LEE COTHRAN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Western District of Louisiana

_____

August 8, 2002

Before DAVIS, SMITH, and BENAVIDES,
    Circuit Judges.

JERRY E. SMITH, Circuit Judge:

   David Cothran pleaded guilty to one count
of mail fraud in violation of 18 U.S.C. §§ 1341
and 2.  He attacks his conviction and sentence
on many grounds.  Finding no error, we affirm.

I.

   Cothran owned Capricorn Services, which
sold computers.  The business fell on hard
times, and Cothran began defrauding his sup-
pliers.  The government maintains that the
scope of his intentional fraud swept broadly;
Cothran states that his initial underpayments
and bad checks were accidental, and he began
defrauding his suppliers at a later date.

   In 1996, Cothran paid two suppliers with
company checks drawn from closed accounts.
On November 5, 1996, he paid for a delivery
from Gateway Computers using a company
check for $14,022.  On December 18 and 20,
he paid for deliveries from Micron Electronics

with checks that totaled $10,281. When the bank declined to honor the checks, vendors' losses totaled $24,303.

In 1997, Cothran began ordering computers and making only partial payments, failing to pay for them altogether, paying with checks drawn on a closed account, and eventually forging vendor authorizations for delivery. On March 5, 1997, he accepted a delivery from Gateway Computers and wrote a check on a closed account for $16,820. On March 28 and May 14, 1997, he convinced EPS Technologies to ship him $33,799. worth of computer equipment, for which he made only a partial payment. On June 18 and July 29, 1997, he convinced PC Connections to ship him $45,088.75 worth of computer equipment, and he made only partial payment. On July 3, 1997, Anson Computers, Inc., supplied him with $10,670 of equipment, and Cothran never paid. On July 29, he turned again to Gateway Computers, who delivered equipment for a cashier's check in the amount of $5,796; after receiving delivery, Cothran stopped payment on the check.

In September or October 1997, Cothran made a series of orders that, on their face, required him to deceive the vendor or carrier before taking delivery. The government alleges that on September 12, 1997, Cothran began actually forging the computer suppliers' authorizations for him to pay by company check. On September 12, 1997, a letter was faxed from a company claiming to be Cyber-Max Computer and authorizing United Parcel Service ("UPS") to accept payment by company check. The government argues that Cothran faxed the letter; Cothran claims that a former employee, Ryan Anderson, sent the fax and check.

Cybermax Computer delivered $46,533 worth of computer equipment in exchange for a worthless check. Cothran admits that in October 1997, he faxed a forged authorization to Federal Express on behalf of Midwest Micro, which delivered $7,516.49 of computer equipment, and Cothran tendered a check on a closed account. In November 1997, Cothran ordered $5,047 in equipment from Arlington Computers, and the UPS delivery person dropped off the computers without collecting payment. Cothran did not ever tender the money to Arlington Computers.

Cothran continued this pattern well into 1998. On January 14, 1998, Dell Computers sent Cothran $29,253.12 worth of computers; he disputed the price terms and failed to make any payments. On March 31, 1998, Multi-Tech delivered $15,007.80 in computer equipment in exchange for a check drawn on a closed account. On June 16, 1998, Federal Express received a letter from a company claiming to be Quantex Microsystems, Inc., and authorizing Cothran to pay by company check. Quantex delivered $31,396 in computer equipment and received a check on a closed account in return. In June 1998, UPS received a faxed letter purportedly from DTK Computers, Inc., authorizing payment by company check. UPS delivered computer equipment worth $11,060 in exchange for a check drawn on a closed account.

## II.

The grand jury returned a fourteen-count superseding indictment charging Cothran with mail fraud in violation of 18 U.S.C. § 1341 and 2. Cothran unsuccessfully moved to dismiss counts 1-7 and 10-12 for failure to state an offense against the United States. The government then filed a bill of information charging Cothran with one count of mail fraud.

Cothran waived his right to indictment and pleaded guilty to the bill of information, whereupon the indictment was dismissed.

At sentencing, the court adopted the factual findings and guideline application of the presentence report ("PSR"). The court classified Cothran's criminal history as category II and calculated a total offense level of 13, yielding a guideline range of 15-21 months' imprisonment. The court sentenced Cothran to 18 months' imprisonment and a three-year term of supervised release. As part of his supervised release, the court forbade Cothran from gambling and gave the probation office permission to require substance abuse treatment. The court also ordered Cothran to pay $232,177.16 in restitution.

### III.

Cothran argues that his indictment failed to state an offense against the United States; he did not voluntarily enter the plea bargain; his counsel provided ineffective assistance; the prosecution violated the Fifth Amendment's Double Jeopardy Clause; the prosecutor acted vindictively and maliciously; and the United States unlawfully seized evidence. We reject each of these arguments in turn. Many are waived.

### A.

Cothran argues that many counts of the indictment fail to state an offense against the United States. Cothran, however, voluntarily waived his right to an indictment when he pleaded guilty and agreed to the bill of information. Rule 7(b), FED. R. CRIM. P., permits the defendant to waive prosecution by indictment, in open court, for an offense punishable by a term of imprisonment of more than one year. We repeatedly have upheld defendants' waivers of their right to

indictment.[1]

Relying on *United States v. Meacham*, 626 F.2d 503, 509-10 (5th Cir. 1980), Cothran argues that the guilty plea does not waive his right to challenge the sufficiency of the indictment. We so held in *Meacham*, because we classified as jurisdictional the requirement that the indictment state an offense. *Id.* In *United States v. Cotton*, 122 S. Ct. 1781, 1785 (2002), the Court held that defects in the indictment are not jurisdictional. The Court applied plain error review because a defendant had failed to challenge the sufficiency of the indictment before or during trial. *Id.* at 1786.

*Cotton* demonstrates that standard waiver principles apply to defects in the indictment. Cothran's guilty plea and waiver to the right of indictment were knowing and voluntary, so he waived any defects in the indictment.

### B.

Cothran argues that he did not voluntarily enter the plea bargain because his attorney impermissibly pressured him to accept the plea. He did not attempt to withdraw his plea in the district court and raises this argument for the first time on appeal, so we review its voluntariness for plain error. FED. R. CRIM. P. 52(b); *United States v. Milton*, 147 F.3d 414, 420 (5th Cir. 1998).

---

[1] *United States v. Gaudet*, 81 F.3d 585, 590 (5th Cir. 1996) (holding that if defendant pleads guilty to bill of information that supersedes the indictment, his failure to understand indictment is irrelevant); *United States v. Moore*, 37 F.3d 169, 173 (5th Cir. 1994) ("Defendant's acquiescence in the filing of their signed waiver amounted to a waiver of indictment in open court."); *United States v. Montgomery*, 628 F.2d 414, 416 (5th Cir. 1980) (finding waiver voluntary).

The defendant must enter the plea agreement voluntarily. *See Boykin v. Alabama*, 395 U.S. 238, 242-44 (1969). Rule 11(d), FED. R. CRIM. P., requires the court to address the defendant in open court and determine that the plea is voluntary and not the result of unlawful force, threats, or promises. The Supreme Court has defined a voluntary plea:

> A plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g., bribes).

*Brady v. United States*, 397 U.S. 742, 755 (1970) (internal quotations omitted) (quoting *Shelton v. United States*, 246 F.2d 571, 572 n.2 (5th Cir. 1972) (en banc), *rev'd on other grounds*, 356 U.S. 26 (1958).

At the plea colloquy, Cothran stated that his plea was free and voluntary and made with the advice of counsel. He stated that he had discussed the matters with his attorney, and he said that he was satisfied with his attorney's advice. When the district court asked "Did anybody lean on you, twist your arm, use undue persuasion to cause you to enter a plea of guilty today?," Cothran responded "no, sir." Reviewing courts give great weight to the defendant's statements at the plea colloquy.[2]

To counter his statements in open court, Cothran alleges that the general mental strain of the situation and his attorney's heavy-handed advice compromised voluntariness. According to Cothran, on the day he was scheduled to sign his plea agreement, he changed his mind. The defense attorney informed the United States and then warned Cothran that "you have made it bad for yourself". The attorney had earlier told Cothran that his own "opening statement will convict you." In response to his attorney's admonitions about the consequences of pleading not guilty, Cothran reversed again and decided to plead guilty.

A defense attorney should make informed predictions about the consequences of either pleading guilty or going to trial. We have held that a defense lawyer's stern warnings about the client's chances of success at trial, the potential for prison time, and the lawyer's potential withdrawal do not compromise voluntariness.[3] Even if Cothran's lawyer

---

[2] *Blackledge v. Allison*, 431 U.S. 63, 73 (1977) ("Solemn declarations in open court carry a strong presumption of verity."); *United States v. Abreo*, 30 F.3d 29, 31 (5th Cir. 1994) (placing great weight on defendant's statements at plea colloquy); *United States v. Madonado-Rodriguez*, 64 F.3d 719, 733 (1st Cir. 1995) (giving credence to finding, at plea colloquy, that defendant had not been pressured rather than to defendant's later, self-serving statements).

[3] *Uresti v. Lynaugh*, 821 F.2d 1099, 1101-02 (5th Cir. 1987) (finding plea voluntary where attorney warned client that he would be lucky to get 99 years if he went to trial and threatened to withdraw if client pleaded not guilty); *Jones v.*
(continued...)

4

warned that he would almost certainly lose at trial and face a harsh sentence, these were warnings, not threats. Cothran's statements during the plea colloquy should control.

Cothran also states that his counsel "told [him] to sign [the] rule 11 package without any consultation as to its content." Cothran's position flatly contradicts the statements he made at the plea colloquy. The court asked Cothran whether he had consulted with his lawyer about the plea, the bill of information, and the constitutional rights that he was waiving. Cothran responded that he had so consulted with his lawyer. Once again, we give the statements during the colloquy greater weight than we give unsupported, after-the-fact, self-serving revisions.

If, on the other hand, by the rather cryptic statement in his appellate brief, Cothran means that he did not have an opportunity to read the plea or bill of information, then it is irrelevant. We have held that a defendant's after-the-fact testimony that he did not read the plea is irrelevant where the colloquy demonstrates that he understood the plea. *United States v. Navejar*, 963 F.2d 732, 735 (5th Cir. 1992). We reject Cothran's arguments that he did not enter the plea voluntarily.

Cothran also argues that his trial counsel was constitutionally ineffective, both in recommending a plea and in arguing his sentence to the district court. Cothran states that he sought to have his attorney removed. Cothran's counsel did move for removal in the

---

³(...continued)
*Estelle*, 584 F.2d 687, 689-90 (5th Cir. 1978) (holding that defense counsel's impatience and stern demand for an answer were not enough to make guilty plea involuntary).

district court because of his client's uncooperativeness, but a transcript of that hearing was not included in the record on appeal. We do not know whether Cothran sought to have his attorney removed for the same reasons that he now claims his assistance to have been ineffective.

We do not usually review claims of ineffective assistance of counsel on direct appeal, because the record is rarely sufficiently developed to enable appellate review. *United States v. Jennings* 891 F.2d 93, 95 (5th Cir. 1989). Where a defendant's motion to remove counsel does not raise the same grounds as does the ineffective assistance claim, we will not address the question on direct appeal. *United States v. Andrews*, 22 F.3d 1328, 1345 (5th Cir. 1994). We therefore affirm the district court's assessment of Cothran's plea as voluntary, without prejudice to Cothran's right to raise an ineffective assistance of counsel claim in a proceeding under 28 U.S.C. § 2255. We do not mean to imply that such a claim would have merit.

C.

Cothran argues that the federal prosecution violates the Fifth Amendment's Double Jeopardy Clause. In April 2000, Cothran pleaded guilty to attempted felony theft in Louisiana state court and received a six-month suspended sentence. In May 2000, the United States indicted him for the same underlying conduct.

Cothran's guilty plea might not waive a double jeopardy claim apparent from the record and the face of the state and federal indictments. A defendant who pleads guilty may raise a double jeopardy claim on collateral review if "the determination of that the second indictment should not go forward should have

been made by the presiding judge at the time the plea was entered on the basis of the underlying record."[4] This principle presumably extends to direct review as well. Cothran did not raise this argument in the district court, so we review it only for plain error. *Milton*, 147 F.3d at 420.

Two different sovereigns may prosecute a person for a single act that violates their respective laws. *Heath v. Alabama*, 474 U.S. 82, 88-89 (1985). Subsequent federal prosecution might violate the Constitution only if the "federal prosecution was a sham or tool of the state prosecution." *United States v. Moore*, 958 F.2d 646, 650 (5th Cir. 1992). The defendant bears the burden of proving that one sovereign used another as a tool or sham. *United Sates v. Logan*, 949 F.2d 1370, 1380 n.16 (5th Cir. 1991). Mere propinquity between the state and federal prosecutions will not satisfy the defendant's burden. *United States v. Cooper*, 949 F.2d 737, 751 (5th Cir. 1991).

Cothran alleges only that a single police officer participated in both the state and federal proceedings. He does not detail that officer's involvement and does not point to specific portions of the record. Assuming the truth of his allegations, they do not even begin to satisfy his burden of proving that Louisiana used the federal prosecution as a "tool or sham." Without more, a sovereign would not sacrifice its independence by consulting another state's investigators and pooling information.

### D.

"A plea of guilty admits all the elements of a formal criminal charge and waives all non-jurisdictional defects in the proceedings leading to conviction."[5] The plea waives claims of governmental misconduct during the investigation and improper motives for prosecution. *United States v. Owens*, 996 F.2d 59, 60 (5th Cir. 1993). A guilty plea also eliminates objections to searches and seizures that violate the Fourth Amendment.[6] We therefore refuse to consider Cothran's arguments about the impropriety of the investigation and search of his business.

### IV.

Cothran argues that the district court incorrectly calculated his criminal history category, the amount of loss, and restitution. He also avers that the district court erred by failing to grant him a downward departure based on family circumstances and by attaching certain conditions to his supervised

---

[4] *United States v. Broce*, 488 U.S. 563, 575 (1988); *Taylor v. Whitley*, 933 F.2d 325, 327 ("[A] defendant may assert in a collateral attack that the face of the indictment or record against him establishes that his convictions violate the constitutional prohibitions against double jeopardy.").

[5] *United States v. Smallwood*, 920 F.2d 1231, 1240 (5th Cir. 1991). *See United States v. Bell*, 966 F.2d 914, 915 (5th Cir. 1992) (collecting Fifth Circuit cases).

[6] *United States v. Wise*, 179 F.3d 184, 186 (5th Cir. 1999) ("When the trial court denies a motion to suppress and the defendant subsequently enters an unconditional plea of guilty, the defendant has waived the right to raise further objection to that evidence."); *Franklin v. United States*, 589 F.2d 192, 194-95 (5th Cir. 1979) ("Franklin's claims regarding Miranda warnings, coerced confessions, perjury, and illegal searches and seizures are not jurisdictional in nature and thus do not require our consideration.").

release.[7]

We review *de novo* the application of the sentencing guidelines, but we review factual findings only for clear error. *United States v. Haas*, 171 F.3d 259, 268 (5th Cir. 1999). Cothran bears the burden of showing the information contained in the PSR "cannot be relied on because it is materially untrue, inaccurate, or unreliable." *United States v. Londono*, 285 F.3d 348, 354 (5th Cir. 2002) (internal quotation and citation omitted). "In general the PSR bears sufficient indicia of reliability to be considered as evidence by the district court, especially when there is no evidence in rebuttal." *Id.* "Mere objections do not suffice as competent rebuttal evidence." *United States v. Lowder*, 148 F.3d 548, 552 (5th Cir. 1998) (citation omitted).

### A.

Cothran challenges the inclusion of two prior offenses in the criminal history calculation. The PSR recommended a single guideline point for Cothran's 1987 conviction in a Texas court of unlawfully carrying a weapon. Although the sentencing guidelines do not augment a criminal defendant's right to collateral attack of past convictions,[8] Cothran

now claims innocence.

Cothran states that he possessed a firearm dealer's license from the Bureau of Alcohol Tobacco and Firearms. He claims that no local or federal law makes it a crime to possess a firearm with the proper authority in plain view. He reasons that this makes the conviction unconstitutional and permits him to challenge it. Cothran, however, did not raise this argument in his objections to the PSR. He has not provided any record evidence that he had a federal license to sell firearms in 1987. He offers zero proof to counter the state court's finding of guilt. That finding is enough, absent evidence that the conviction was reversed, vacated, or ruled constitutionally invalid.

Cothran also argues that his guilty plea to possession of marihuana should not be included in the sentence calculations because the county court sentenced him to deferred adjudication. We have held that U.S.S.G. § 4A1.1(c) includes Texas's deferred adjudications, because the defendant enters a guilty plea prior to the deferral. *United States v. Gooden*, 116 F.3d 721, 724 (5th Cir. 1997); *United States v. Stauder*, 73 F.3d 56, 57 (5th Cir. 1996). We reject Cothran's challenges to the criminal history calculations.

### B.

Cothran challenges the finding that his fraud and relevant conduct caused a loss of over $120,000. The PSR concluded that every unpaid debt described grew out of an intentional scheme to defraud vendors. As a result, the PSR calculated the loss as

---

[7] Cothran generally asserts that the district court violated FED. R. CRIM. P. 32, erred in focusing on relevant conduct, did not make specific findings about the PSR, and made erroneous factual conclusions. Although we construe *pro se* briefs liberally, these arguments are so conclusional as to be incomprehensible, so we consider them not adequately briefed and abandoned. *Yohey v. Collins*, 985 F.2d 222, 224-25 (5th Cir. 1993); *Brinkmann v. Dallas County Deputy Sheriff Abner*, 813 F.2d 744, 748 (5th Cir. 1987). We address Cothran's more specific arguments *infra*.

[8] United States Sentencing Commission, (continued...)

---

[8](...continued)
GUIDELINES MANUAL, § 4A1.2, comment. (n.6) (Nov. 2000).

$282,290.16 and recommended an eight-level enhancement under U.S.S.G. § 2F1.1(b)(1). The guidelines recommend a seven-level enhancement for a loss greater than $120,000. At sentencing, the court concluded that, although some of Cothran's challenges might have merit, they would not reduce the loss amount below $120,000. The sentence of eighteen months is at the high end of the guideline range for fraud that creates a loss greater than $120,000.

In calculating the loss or harm caused by fraudulent conduct, the sentencing court should make a reasonable estimate given available information. U.S.S.G. § 2F1.1, comment. (n.9). The court often will base that estimate on the fair market value of the item stolen or destroyed. U.S.S.G. §2F1.1, comment. (n.8); *United States v. Izydore*, 167 F.3d 213, 223 (5th Cir. 1999) We give the district court wide latitude to determination the amount of loss. *United States v. Alford*, 142 F.3d 825, 831 (5th Cir. 1998). The determination of the amount of loss is a factual finding reviewed for clear error. *United States v. Glinsey*, 209 F.3d 386, 393 (5th Cir.), *cert. denied*, 531 U.S. 919 (2000).

Relevant conduct includes all actions and omissions caused by the defendant or undertaken in the commission of a criminal scheme. U.S.S.G. § 1B1.3. We review for clear error the classification of behavior as relevant conduct. *United States v. Peterson*, 101 F.3d 375, 385 (5th Cir. 1996).

The court included two broad classes of transactions to find that the total loss amount was greater than $120,000: (1) Cothran forged a letters from the vendor and faxed the letters to the carrier to alter delivery terms and create total losses of $96,505.49; (2) Cothran

paid with company checks drawn on a closed business account and caused losses of $56,130.80.

Cothran challenges only one of the transactions in the first category. He argues that one of his employees, ordered the computer equipment, faxed the false approval to the carrier, and wrote the check for $46,533 on the closed account. Cothran's brief does not provide record citations, and we cannot find a copy of the computer equipment order, fax, or check in the record. The court also noted that it would be difficult to determine who had actually written the fax, because the signer forged the signature of another. The PSR and the court concluded that Cothran's admissions that he used this scheme on separate occasions sufficed to show his involvement with this fraud. We cannot say that the court committed clear error by holding Cothran responsible, given that he did not present any evidence.[9]

Cothran challenges the inclusion of all of the checks drawn on closed accounts. He points to *Williams v. United States*, 458 U.S. 279, 284-85 (1982), holding that 18 U.S.C. § 1014 does not proscribe passing a bad check issued by a federally insured bank. The Court noted that the check itself is not a representation about the balance in the account, and the bad check does not defraud

_____

[9] Cothran argues that the losses suffered by Quantex should not be included because the government had launched a sting operation and there was no risk of actual loss. This argument is frivolous; the guidelines permit the court to look to intended loss, USSG § 2F1.1, comment. (n.8); *United States v. Moser*, 123 F.3d 813, 830 (5th Cir. 1997), and Cothran admitted this loss in his guilty plea and admission to the bill of information.

the financial institution. *Id.* The Court emphasized that the government had not established the defendant's intent or a scheme to defraud the bank. *Id.* at 286-87.

The government, however, did not charge Cothran under § 1014 for defrauding banks but under §§ 1341 & 2 for using the mails to defraud the computer vendors. To convict under these statutes, the government must prove (1) that the defendant used the mail (2) to execute a scheme to defraud (3) with the specific intent to defraud. *United States v. Tencer*, 107 F.3d 1120, 1125 (5th Cir. 1997).

The district court concluded that intentionally writing checks on closed accounts was part of the larger fraudulent scheme, where there also was evidence that Cothran falsified faxes from the vendors. That scheme defrauded the *vendors* out of their computer equipment. In this case, unlike in *Williamson*, the district court reasonably inferred both a larger scheme to defraud and an intent to defraud based on the offenses of conviction and relevant conduct.[10] Where the government has proven the defendant had a specific intent to defraud and used bad checks as part of a broader scheme, we have upheld sentences based on the value of the kited or bad checks. *United States v. Frydenlund*, 990 F.2d 822, 825-26 (5th Cir. 1993) (calculating loss based on total amount of overdraft because the guideline looks to the immediate, out-of-pocket loss caused).

_____

[10] We have upheld a conviction under 18 U.S.C. § 1344 for attempting to issue checks on a non-existent account where the government proved a larger scheme and specific intent to defraud. *United States v. Church*, 888 F.2d 20, 23-24 (5th Cir. 1989).

Finally, Cothran levies a broad charge at both categories of loss by arguing that the court should have offset the loss amounts by his partial, later payment. Payment of restitution after the discovery of a fraudulent scheme cannot reduce the loss amount. *United States v. Akin*, 62 F.3d 700, 702 (5th Cir. 1995). The district court did not commit clear error by finding that Cothran's criminal scheme created at least $120,000 in losses.

C.

Cothran argues that the court set a grossly excessive amount of restitution, $232,177.16. We review *de novo* the legality of a restitution award. *United States v. Norris*, 217 F.3d 262, 271 (5th Cir. 2000). If the award is legally permitted, we review it only for abuse of discretion. *Id.*

Cothran argues that because he pleaded guilty to only one count of mail fraud, and the bill of information listed only a single fraudulent transaction in June 1998, his restitution should be limited to the consequences of that transaction. The Victims and Witness Protection Act of 1982 ("VWPA") requires restitution to the victim or victims. 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii). In the case of an identifiable victim, the court shall "order restitution to each victim in the full amount of each victim's losses." 18 U.S.C. § 3664(f)(1)(A).

Cothran relies on *Hughley v. United States*, 495 U.S. 411, 420 (1990) ("*Hughley I*"), which held that where the defendant pleads guilty to only one count, the VWPA limits restitution to the damage caused by that single count. Congress subsequently amended the VWPA to provide that where a defendant pleads guilty to an offense involving a scheme, conspiracy, or pattern of criminal activity, the

court may award restitution to any person directly harmed by the course of conduct. 18 U.S.C. § 3663(a)(2); *United States v. Hughley*, 147 F.3d 423, 437 (5th Cir. 1998) ("*Hughley II*"). We have reconciled *Hughley I* and the congressional amendments by holding that where a fraudulent scheme is an element of the conviction, the court may award restitution for "actions pursuant to that scheme." *United States v. Stouffer*, 986 F.2d 916, 928 (5th Cir. 1993).

The bill of information describes the actions that Cothran took to defraud Quantex in June 1998. On June 16, 1998, he used the names Charles Johnson and Ram Technology to order twenty computers from Quantex, which agreed to ship the computers by Federal Express, cash on delivery, with payment to be tendered by cashier's check. Cothran transmitted a fax purporting to be from Quantex that permitted payment with a personal or company check; he then tendered a check on a closed account. The indictment had described this as count 13 and "part of the scheme and artifice to defraud."

Although we sometimes have struggled to define the outer bounds of a particular fraudulent scheme, we have focused on the actions alleged in the indictment and their temporal scope.[11] In this case, count 13 of the indictment and the bill of information identified only the fraud of Quantex in June 1998. On the other hand, count 13 contains language suggesting that the Quantex fraud was part of a larger scheme or pattern of fraudulent activity.

Both the government and Cothran's interpretations are plausible, but based on the indictment and bill of information alone, the scheme was limited to the Quantex fraud in June 1998. The defendant has no control over the language that the government uses in the indictment; the bill of information more accurately reflects the scope of the agreement between Cothran and the government. Cothran also pleaded guilty to the bill of information, not the indictment. The bill of information, however, is not our only source of information about the scope of the scheme.

The government points out that the plea agreement provided that "the Court may order [Cothran] to make restitution to the victims of his scheme to defraud and to other computer and delivery companies as set out in the superseding indictment to whom the Defendant is indebted . . . ." The plural word "victims" and reference to "other computer and delivery companies" make plain that this agreement goes beyond Quantex and beyond June 1998. We must decide whether the plea

---

[11] *Hughley II*, 147 F.3d at 438 (explaining that the restitution award should be limited to the temporal scope of the count of conviction); *Stouffer*, 986 F.2d at 928-29 (explaining that where indictment defined specific time period, scheme to defraud included all losses caused during that time period, even though defendants pleaded guilty only to specific instances of fraud within that time period); *United States v. Pepper*, 51 F.3d 469, 473 (5th Cir. 1995) (finding that district court could (continued...)

[11](...continued)
include all losses imposed during relevant time-frame and by the methods described in the indictment because they were part of a larger scheme); *United States v. Chaney*, 964 F.2d 437, 453 (5th Cir. 1992) (ruling that an individual's conviction for conspiring to and making a false entry on a questionnaire for bank officers was part of a larger scheme to cause the bank to issue bad loans and holding the defendant responsible for all the loans).

agreement affects our interpretation of the scope of the scheme alleged in count 13 and the bill of information.

In *United States v. Arnold*, 947 F.2d 1236, 1238 (5th Cir. 1991), we considered a plea agreement when defining the scope of a fraudulent scheme and amount of restitution. *Arnold* was an easier case: The defendant did not object in the district court to the characterization of the scheme or the restitution amount, further demonstrating the parties' mutual understanding. *Id. Arnold*'s principle, however, extends to cover the current case. Because Cothran's plea agreement contemplated a scheme that went beyond the June 1998 fraud on Quantex to the other frauds alleged in the indictment, we interpret the conviction as part of this broader scheme; under our precedent, the district court could award restitution to all of the victims of the broader scheme.

D.

Cothran argues that the court erroneously imposed two additional conditions on his supervised release. We usually review for an abuse of discretion the conditions added to supervised release. *United States v. Mills*, 959 F.2d 516, 519 (5th Cir. 1992). Cothran did not object to these conditions in the district court, however, so we review only for plain error. *Milton*, 147 F.3d at 420. The district court has the discretion to impose conditions "reasonably related" to "the history and characteristics of the defendant" or his general rehabilitation. 18 U.S.C. § 3583(d); 18 U.S.C. § 3563(b); 18 U.S.C. § 3553(a); U.S.S.G. § 5D1.3(b).

Cothran argues that the court improperly forbade him from gambling or visiting gambling establishments while on supervised release. The court, however, noted the many cash withdrawals that Cothran made from casinos while in such dire financial straits that he had to resort to fraud. The Seventh Circuit has upheld a similar condition based on similar facts. *United States v. Brown*, 136 F.3d 1176, 1186 (7th Cir. 1998). We agree with our sister circuit: A district court does not abuse its discretion, much less commit plain error, by restricting a criminal defendant with a history of excessive gambling from visiting casinos or gambling during supervised release.

The district court also required Cothran to receive "substance abuse treatment as directed by the probation office." The defendant must refrain from drug use as a mandatory condition of supervised release. U.S.S.G. § 5D1.3(a)(4); 18 U.S.C. § 3583(d). The court can require participation in a substance abuse program if it has reason to believe that the defendant abuses controlled substances. U.S.S.G. § 5D1.3(d)(4); 18 U.S.C. § 3563(b)(9). In 1991, Cothran pleaded guilty to possession of marihuana. In 1999, he was arrested and charged with possession of suspected crack cocaine, but the charges were dismissed. Although Cothran denied drug use, the district court had a reasonable basis to grant the probation department the authority to order him into drug treatment.

E.

Cothran appeals the refusal to grant a downward departure based on his mother's ill health. We lack jurisdiction over the denial of a downward departure unless the district court mistakenly believed it lacked the authority to depart. *United States v. Yanez-Huerta*, 207 F.3d 746, 748 (5th Cir.), *cert. denied*, 531 U.S. 981 (2000). The record must demonstrate that the district court misunderstood its authority. *Id.* The court in

11

this case properly understood the scope of its authority but declined to exercise its discretion to depart. We therefore lack jurisdiction to review its decision.

AFFIRMED.