# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

February 6, 2014

Lyle W. Cayce
Clerk

No. 12-31275

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

JUANETTA T. MARTIN; MORRIQUE TURNER, SR.,

Defendants-Appellants

Appeals from the United States District Court
for the Western District of Louisiana
USDC No. 3:10-CR-138

Before KING, CLEMENT, and GRAVES, Circuit Judges.

PER CURIAM:*

Juanetta T. Martin challenges the sufficiency of the evidence supporting her conviction on two counts of committing health care fraud, in violation of 18 U.S.C. § 1347. She also challenges the district court's loss calculation and restitution award. Morrique Turner, Sr., challenges the sufficiency of the evidence for his conviction of conspiracy to commit health care fraud and mail fraud, in violation of 18 U.S.C. §§ 371, 1347, and 1341. For the following reasons, we AFFIRM the defendants' convictions and Martin's sentence.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-31275

## I. FACTUAL AND PROCEDURAL BACKGROUND

A.    Factual Background

1.    Medicaid

Juanetta T. Martin, a licensed practical nurse ("LPN"), worked full-time at Morehouse General Hospital ("Morehouse General") in Bastrop, Louisiana. Martin also owned and operated a home health care business, Bayou Home Bureau, Inc. ("Bayou"). Bayou was incorporated in 1999 to provide residential personal care to elderly and invalid patients. Morrique Turner, Sr., Martin's son, was a Bayou employee who provided homecare services.

From 1999 until 2009, Bayou acted as a Medicaid provider, eventually providing home sitting and nursing care for between fifty and sixty Medicaid patients.[1] As a Medicaid provider, Bayou submitted claims for payment to Medicaid based on fifteen-minute "units" of care. Bayou also was required to maintain the last five years' worth of timesheets and nurse notes including the caretaker's name, as well as a description of the type of care provided.

Abigail Emery, Turner's ex-wife and Martin's former daughter-in-law, was responsible for submitting claims on behalf of Bayou to Medicaid. Emery was trained by Henry Cotton, a consultant and Martin's friend. Cotton instructed Emery to bill the maximum allowable number of units approved by Medicaid each week. Emery eventually became concerned about Bayou's billing practices when Medicaid audited Bayou. As part of the audit, Medicaid asked to see Bayou's timesheets and nurse notes.

After reading Medicaid's manuals and learning that billing was to be done based on timesheets and nurse notes, Emery brought her concerns about Bayou's maximum billing practices to Martin and Cotton. Despite Emery's

---

[1] Medicaid is a public health care benefit program designed to provide free and below-cost health coverage primarily to economically disadvantaged individuals.

warning, Martin and Cotton did not instruct her to change how she submitted claims to Medicaid. In particular, Emery continued receiving timesheets from Bayou's employees twice per month, making it impossible for her to submit accurate information to Medicaid, which required weekly billing.[2]

Furthermore, the billing information Emery received, and which was submitted to Medicaid, did not accurately reflect the care patients were provided. Some Bayou employees would not complete their own timesheets and nurse notes. Turner, for example, paid someone in the office to prepare the nurse notes for him. Sitters also would report caring for patients even when those patients were hospitalized and could not receive the stated care. In one example, Bayou billed Medicaid for care Turner purportedly provided to a patient on September 20, 23, and 25, 2005, despite that patient being hospitalized from September 16 to September 26, 2005. In another example, Lizzie Smith, Martin's co-worker at Morehouse General and a Bayou employee, turned in timesheets and nurse notes stating that she cared for a child patient. In reality, the child was being cared for by her family. Smith asked Martin if this was allowed. Although Martin initially said no because doing so would mean engaging in fraud, Martin several weeks later brought Smith the necessary paperwork to fill out. Martin told Smith that billing Medicaid was "okay" provided that someone was watching the patient.

Partly as a result of these practices, Medicaid repeatedly audited Bayou. In response to each audit, Emery and other Bayou employees would gather the necessary records, including timesheets and nurse notes. If a record did not exist, Martin and Cotton instructed Bayou's employees to create it. Although,

---

[2] Unsurprisingly, Martin fiercely contested much of Emery's testimony at trial. Cotton testified that Emery acted contrary to how he had trained her. In her brief to this court, Martin largely blames Emery for Bayou's billing errors. To the extent Emery was instructed to utilize maximum billing, Martin maintains that the idea was Cotton's, not Martin's.

after the first audit, Medicaid provided Bayou with an "education letter" advising Bayou how to avoid overlapping care issues, Bayou did not change its billing practices. In all, Medicaid sanctioned Bayou eight times for a total of approximately $68,000 for repeatedly billing for services allegedly rendered when a patient was hospitalized.

As a result of Bayou's continuing problems, the Medicaid Fraud Control Unit of the Louisiana Attorney General's Office initiated a criminal investigation. As part of the investigation, certain of Bayou's timesheets and nurse notes were subpoenaed. Bayou produced only some of the required documents. A search warrant executed on Bayou's office revealed a "very unorganized" state of affairs with "documents strewn about." After a criminal indictment was filed, Martin gave three employees, including Smith and Turner, each a form entitled "Affidavit of No Plea Agreement," in which the employee agreed to produce an affidavit stating that he did not wish to take any sort of plea agreement that was offered. Martin had Smith sign and notarize the document.

2.    Blue Cross/Blue Shield

In addition to operating Bayou and working at Morehouse General, Martin, in her individual capacity, enrolled as an LPN provider with Blue Cross/Blue Shield ("Blue Cross").[3] In that role, she cared for two Blue Cross-insured patients, C.S. and E.D. Billing to Blue Cross was based on current procedural technology ("CPT") codes. CPT codes were developed by the American Medical Association, and consist of five-digit codes that represent a specific service provided by the biller. Each claim included information about the patient, the insured, and the services provided.

---

[3] Although not disputing that she enrolled as an individual LPN provider, Martin contends that Cotton advised and assisted her in obtaining her provider number.

No. 12-31275

Although initially billing Blue Cross between $450 and $500 per day of care for each of her two patients, Martin, in less than a year, began submitting daily care charges for as much as $800, and for as much as $1,600 a short time later. Martin's submission of claims exceeding $800,000 "in a very short period of time" led Blue Cross to commence an investigation. As part of this investigation, Blue Cross asked Martin for the patients' records. Martin proved "not very cooperative," and Blue Cross had to make repeated efforts to get Martin to produce the requested documents. Blue Cross was also contacted by a woman identifying herself as Susan Turner, who stated that she would be Martin's point-of-contact. Susan Turner was "very aggressive" and challenged Blue Cross's authority to access the records. Blue Cross eventually warned Martin that if the records were not provided, it would seek to recoup the over $800,000 Blue Cross had paid her.

Martin supplied the records Blue Cross demanded in December 2008. Unlike the claims Martin had previously filed utilizing CPT codes, these records consisted of nurse notes, which included, among other things, the date and times care was provided; the type of care; and patient information such as vital signs, fluid intake and output, and bowel movements. The nurse notes were signed by Martin.

Comparing Martin's nurse notes with the times Martin clocked in to her full-time job revealed that Martin was billing Blue Cross for services allegedly performed on days she was working at Morehouse General. For example, on February 12, 2007, Martin's records state that C.S. was dressed, bathed, fed, and transferred; his urine output and bowel movements were measured; and medications were provided at 11 a.m., 2 p.m., 5 p.m., and 10 p.m. Martin billed Blue Cross $500 for these services. That same day, Martin began work at Morehouse General at 6:35 a.m., and remained there until 6:56 p.m.

5

No. 12-31275

Additional analysis of Martin's records showed that on three occasions she billed Blue Cross for services provided to a patient while he was hospitalized.  In one instance, C.S. was hospitalized on February 6, 2007, and discharged on February 8, 2007.  Martin's records stated that C.S. was provided homecare on each of the three days he was in the hospital, for which Martin billed Blue Cross a total of $1,500.  Martin also continued to work full-time at Morehouse General during this time.

As already noted, Martin's billing practices also fluctuated significantly between February 2007 and September 2008.  Although the services for which Martin billed Blue Cross did not change, the amount she charged increased, with isolated exceptions, substantially.  As to E.D., Martin's claims increased from $450 per day of care in July 2007, to $600 in September 2007, and finally to $800 in December 2007.  For C.S., Martin billed Blue Cross $500 per day of care from February 2007 to May 2007.  From June 2007 to November 2007, Martin increased her daily charges to $700.  Between February 2008 and September 2008, Martin's daily care charges then ranged from as low as $800 to as high as $1,600, before settling at $1,000.  In all, Blue Cross paid Martin $813,422.50, of which $200,853 was for services allegedly rendered on days she worked at Morehouse General, or while C.S. was hospitalized.

B.    Procedural Background

On April 29, 2010, Martin, Turner, Smith, and three other Bayou employees were charged in a ten-count indictment alleging two health care fraud schemes designed to defraud Blue Cross and Medicaid.  As relevant to this appeal, Count 1 of the indictment charged all defendants with conspiracy to commit health care fraud and mail fraud, in violation of 18 U.S.C. §§ 371, 1347, and 1341.  Count 2 charged Martin with committing mail fraud, in violation of 18 U.S.C. § 1341.  Counts 3 and 4 charged her with committing health care fraud relating to her treatment of E.D. and C.S., in violation of 18

No. 12-31275

U.S.C. § 1347.  Count 7 charged Turner with health care fraud pertaining to the scheme to defraud Medicaid, in violation of 18 U.S.C. § 1347.

One of the defendants named in the indictment pleaded guilty to health care fraud prior to trial.  A jury trial as to the remaining defendants commenced on August 6, 2012.  Smith pleaded guilty on the second day of trial. The other defendants moved for judgments of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure at the close of the government's case-in-chief.  The district court denied the defendants' motions.  At the close of the evidence, the defendants re-urged their Rule 29 motions, which, again, were denied.  The jury found Martin guilty on Counts 1, 3, and 4, and found her not guilty on Count 2.  Turner was convicted on Count 1, but acquitted on Count 7.  Martin and Turner filed post-trial motions for new trials and judgments of acquittal.  The district court denied the motions.

Martin's presentence investigation report ("PSR") issued on September 18, 2012.  Martin filed numerous objections, and the PSR was subsequently revised on October 17, 2012.  The revised PSR calculated Martin's offense level to be 22, based on a base offense level of 6, a fraud loss calculation of $921,021.50 resulting in a fourteen-level enhancement, and a two-level enhancement for Martin's role as "organizer, manager, or supervisor" in the criminal activity.  Together with a Criminal History Category of I, the advisory Guidelines sentence range for Martin was forty-one to fifty-one months' imprisonment.   The PSR recommended restitution in the amount of $921,021.50, of which $813,422.50 would be due Blue Cross, and $107,599 would be due Medicaid.

At sentencing, the government presented testimony by Federal Bureau of Investigation Agent Palmer Allen in support of the PSR's loss calculation. Martin's attorney read a letter sent by E.D. attesting to the care Martin had provided her.  Martin's counsel also called another witness to testify about the

7

proper restitution amount for Medicaid.  Finally, counsel called Rufus Martin, Jr., to testify that his mother, Martin, would take him with her while she visited E.D. and C.S. in the mornings before he had to go to school.  After listening to this testimony, the district court determined that the total actual loss suffered by Blue Cross and Medicaid was only $232,310.12.  Of that amount, Blue Cross's actual loss was $200,853, of which $185,800 was attributed to C.S., and $15,053 to E.D.  The remaining loss of $31,457.12 was suffered by Medicaid.  The lower total loss figure reduced Martin's offense level by two points, resulting in a revised Guidelines sentencing range of thirty-three to forty-one months' incarceration.  The district court sentenced Martin to thirty-nine months' imprisonment, a three-year term of supervised release, and restitution in the amount of $200,853 as to Blue Cross and $31,457.12 as to Medicaid.  Turner was sentenced to a two-year term of supervised probation.

Martin timely filed a notice of appeal challenging her conviction as to Counts 3 and 4, and her sentence.  Turner then timely filed a notice of appeal challenging his conviction as to Count 1.

## II. DISCUSSION

Martin and Turner appeal their convictions, each on the basis that the evidence was insufficient to support the jury's verdict.  Martin further challenges the district court's loss calculation and its restitution award because it failed to include the value of the services provided.  We consider each issue in turn.

A.     Evidentiary Sufficiency

1.     Standard of review

We review properly preserved sufficiency-of-the-evidence claims de novo. *See United States v. Ollison*, 555 F.3d 152, 158 (5th Cir. 2009).  While our review is de novo, this court must view all of the evidence, resolve all credibility determinations, and make all reasonable inferences in favor of the jury verdict.

*United States v. Winkler*, 639 F.3d 692, 696 (5th Cir. 2011). We must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Pruett*, 681 F.3d 232, 238 (5th Cir. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "To be sufficient, the evidence need not exclude every reasonable hypothesis of innocence, so long as the totality of the evidence permits a conclusion of guilt beyond a reasonable doubt." *United States v. Hicks*, 389 F.3d 514, 533 (5th Cir. 2004).

    2.    Martin's conviction

Martin argues that the evidence was insufficient to support the jury's verdict as to Counts 3 and 4 of the indictment, which charged her with committing health care fraud upon Blue Cross. The crux of her argument is that the trial evidence showed that she in good faith believed she could bill Blue Cross under her individual provider number for the services of her employees. In support, she states that she never attempted to hide the fact that other LPNs were providing nursing services to E.D. and C.S., and that she engaged in extensive research, including conversations with Blue Cross, before obtaining an individual provider number with Blue Cross. Martin also argues that her understanding that services provided by other LPNs could be charged to Blue Cross is supported by Blue Cross's billing structure, which paid a fixed fee for specific CPT-coded procedures. She explains her escalating billing rate as a billing error by Blue Cross.

The government responds that, viewing the evidence in the light most favorable to the verdict, a rational jury could have convicted Martin of health care fraud beyond a reasonable doubt based on her failure to provide the care described in the nurse notes. It states that "[c]ontrary to Martin's argument, the government did not assert that it was fraud if Martin billed for services

rendered by another," but rather "[t]he government proved that Martin billed Blue Cross for services that were not rendered." The government counters Martin's explanation for her escalating charges by observing that the wide variations occurred over a relatively short period of time (between February 2007 and September 2008), and without any accompanying change in services.

18 U.S.C. § 1347, the statute under which Martin was convicted, provides that

> (a) Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice--
>> (1) to defraud any health care benefit program; or
>> (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,
>
> in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both. . . .
> (b) With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section.

18 U.S.C. § 1347.

After considering Martin's sufficiency-of-the-evidence argument, we find the following evidence sufficient to affirm Martin's conviction. Martin applied for an individual provider number from Blue Cross. Although she could have created a business entity and applied for a provider number that would allow her to bill Blue Cross for services rendered by her employees, she instead elected to obtain a provider number as an individual. In that capacity, she billed Blue Cross over the course of several months vastly different amounts for the same services. As to one of her two patients, Martin submitted claims that fluctuated between $450 per day of care in July 2007 and $800 per day of care in December 2007. As to her other patient, Martin submitted claims for

No. 12-31275

$500 per day of care from February 2007 to May 2007, before eventually filing daily claims for as much as $1,600 in March 2008.

When Blue Cross requested supporting billing documentation, Martin was "not very cooperative." After Blue Cross persisted in its demand for the records it was contacted by Susan Turner, Martin's new point-of-contact, who proved "very aggressive" and challenged Blue Cross's authority to access the records.

The nurse notes that eventually were sent to Blue Cross contain Martin's signature at the bottom of each note in the section reading "Nurse's Signature." Trial testimony by Blue Cross investigator Kandyce Cowart stated that such a signature represented that the signing nurse provided the care detailed in the note. Martin does not dispute that on at least some of the days when she was working at Morehouse General (or when one of her patients was hospitalized), she did not personally provide all the care listed in the nurse notes.

This evidence was sufficient for the jury to find Martin guilty of committing health care fraud, in violation of 18 U.S.C. § 1347. Martin's arguments to the contrary are unpersuasive. She relies on Cotton's testimony that she carefully researched Blue Cross's billing practices, and on E.D.'s testimony that the billed-for services were provided, but the jury was entitled to find those witnesses not credible.

Martin also attacks her conviction by relying on Blue Cross's billing structure. She describes Blue Cross's purported reason for not allowing an individual to bill for employees' services—double-billing—as nonsensical because if two providers billed Blue Cross for the same care to the same client, then Blue Cross would surely investigate. Martin appears to suggest that the mere fact that a scheme to defraud an insurance company would likely fail due to that company's safeguards bolsters her good-faith-belief defense. To the

11

extent this argument is in any way persuasive, the jury was able to consider it, and evidently rejected it in rendering a guilty verdict.

Paradoxically, while Martin argues that Blue Cross's ability to catch mistakes like double-billing supports her understanding of Blue Cross's billing structure, she also argues that Blue Cross's propensity for making mistakes explains her escalating billing rates. Martin quotes Cowart's trial testimony that Blue Cross would mistakenly pay claims without cross-checking whether the amount matched what Blue Cross had agreed to pay under a particular plan. Martin's argument appears to be that there must have been nothing wrong with her billing if Blue Cross paid it. As the government rightly observes, "the evidence that [Martin] cites explains only why Blue Cross paid the ridiculously high bills she was submitting. It does not address why she submitted them."

Turning to the nurse notes, Martin contends that Blue Cross did not pay claims according to the amount of time it took to complete a procedure, but only based on whether the service was provided. From this premise, Martin leaps to the conclusion that the jury should not have interpreted the nurse notes to mean that the signing nurse was required to provide the care detailed therein. We understand Martin to mean that because Blue Cross allegedly was concerned only with whether the procedure was performed, not how long it took, Blue Cross also must not have been concerned with who provided the care, so long as it was provided by an LPN like Martin. Whatever persuasive value Martin's argument might have in isolation from the other trial evidence is undone by considering that evidence in its entirety. As we have observed, Cowart's trial testimony was that by signing the nurse notes, Martin represented that she herself provided the care in question. Martin also charged an ever-changing amount for the same services. Additionally, she charged Blue Cross for care that neither she, nor any other LPN in her employ,

could have provided because the patient who purportedly received it was, at that, hospitalized.

In addressing sufficiency-of-the-evidence arguments, we ask only "whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Grant*, 683 F.3d 639, 642 (5th Cir. 2012) (internal quotation marks and citation omitted). Here, the jury heard evidence of Blue Cross's billing structure and was unpersuaded by Martin's novel interpretation of it. The jury acted as a rational trier of fact in finding Martin guilty in light of the trial evidence. Accordingly, we affirm Martin's conviction for health care fraud.

3.     Turner's conviction

Like Martin, Turner challenges the sufficiency of the evidence in this case. Turner argues that there was insufficient evidence to convict him on Count 1 of the indictment, which charged him with conspiracy. According to Turner, the only evidence potentially linking him to the conspiracy relates to two distinct time periods: August 28 to August 31, 2005; and September 16 to September 26, 2005. Turner's argument as to both of these periods is the same. He does not dispute that timesheets, nurse notes, and paychecks show that he purportedly provided homecare services to a Medicaid patient on those dates. He also does not dispute that the patient listed in those records could not have received the stated care because the patient was hospitalized. Turner instead argues that this overlap is insufficient to convict him of conspiracy because he worked more hours that were not billed to Medicaid caring for the patient while the patient was not in the hospital, than hours that were billed while the patient was hospitalized. In other words, he asserts that Medicaid made a net gain.

The government in its response contends that the evidence at trial established a pattern of fraudulent billing by Bayou. It relies on nurse notes

that show that Turner provided care to a patient, J.M., while that patient was hospitalized. The government draws a parallel to other care purportedly provided by other Bayou caretakers, which it says was similarly fraudulent. Relying on *United States v. Stephens*, 571 F.3d 401, 404 (5th Cir. 2009), the government contends that "[t]his evidence of concerted action establishes the conspiracy and Turner's knowing participation in it."

Under 18 U.S.C. § 371, the government was required to prove three elements beyond a reasonable doubt to convict Turner of conspiracy to commit health care fraud: "(1) [that] two or more persons made an agreement to commit health care fraud; (2) that [Turner] knew the unlawful purpose of the agreement; and (3) that [Turner] joined in the agreement willfully, that is, with the intent to further the unlawful purpose." *Grant*, 683 F.3d at 643. "The [g]overnment is not required to provide direct evidence of the conspiracy." *Stephens*, 571 F.3d at 404. "Circumstantial evidence can prove knowledge and participation." *United States v. Njoku*, 737 F.3d 55, 63 (5th Cir. 2013).

Turner's arguments largely amount to asking us to vacate his conviction because there was no direct evidence of his participating in or knowing of the conspiracy. However, "voluntary participation may be inferred from a collection of circumstances, and knowledge may be inferred from surrounding circumstances." *Stephens*, 571 F.3d at 404 (citation omitted). Here, the trial evidence showed that timesheets and nurse notes were submitted at Turner's behest, which represented that he provided homecare to a patient who was, at the time, hospitalized. The jury was free to consider Turner's untruthful timesheets and nurse notes in the context of other Bayou employees submitting similarly inaccurate reports, which also alleged care that was not actually provided. For example, one patient was admitted into a hospital on June 14, 2008, and discharged on July 16, 2008. Bayou nevertheless billed Medicaid for home services during this time, and nurse notes by one of Turner's co-

defendants documented care from June 16 through June 22, 2008. Another patient was hospitalized from December 3 to December 19, 2005. Bayou billed for services rendered from December 5 to December 11, 2005, and nurse notes by another co-defendant stated that services were rendered on December 5 through December 9, and December 13 through December 15, 2005. From these examples and others, the jury had sufficient evidence of fraudulent activity to compare to Turner's own dishonest acts, and infer Turner's willing participation in Bayou's scheme to defraud Medicaid.

That Turner did not personally prepare the timesheets or nurse notes is irrelevant because other trial evidence showed that Turner paid another employee to prepare them for him. Specifically, Emery testified that Dewanda Turner prepared the forms for Turner. Moreover, trial testimony by Bryan Edwards, an investigator with the Louisiana Attorney General's Office, showed that it was the caretaker's responsibility to accurately fill out the timesheets. The jury thus could conclude that the information contained in the timesheets and nurse sheets was provided by Turner.

It likewise is irrelevant that Medicaid may have been charged less than the number of hours Turner worked. The operative grounds for Turner's conviction was his submission of timesheets and nurse notes seeking payment for care Turner did not, in fact, provide. It is that act which caused Medicaid's injury, and permitted the jury to find him guilty of conspiracy. Because there was sufficient evidence from which the jury could infer Turner's participation in the scheme to defraud Medicaid, his conspiracy conviction is affirmed.

B.    Loss Calculation and Restitution Award

1.    Standard of review

This court reviews a district court's application of the Guidelines de novo and reviews its findings of fact at sentencing for clear error. *United States v. Klein,* 543 F.3d 206, 213 (5th Cir. 2008). A court "review[s] de novo the district

court's method of determining loss, while clear error review applies to the background factual findings that determine whether or not a particular method is appropriate." *United States v. Isiwele*, 635 F.3d 196, 202 (5th Cir. 2011). "The determination of the amount of loss is a factual finding reviewed for clear error," and "[w]e give the district court wide latitude to determin[e] the amount of loss." *United States v. Cothran*, 302 F.3d 279, 287 (5th Cir. 2002).

The legality of a restitution order is reviewed de novo. *United States v. Adams*, 363 F.3d 363, 365 (5th Cir. 2004). A legal restitution order is reviewed for abuse of discretion. *Cothran*, 302 F.3d at 288. This court "may affirm in the absence of express findings 'if the record provides an adequate basis to support the restitution order.'" *United States v. Sharma*, 703 F.3d 318, 322 (5th Cir. 2012) (footnote omitted), *cert. denied*, 134 S. Ct. 78 (2013).

2.      Martin's sentence

The district court found that Blue Cross's actual loss was $200,853 and ordered restitution for the same. Martin asserts that the district court erred in its loss calculation, and consequently also entered an erroneous restitution order, by failing to credit the value of the LPN services she provided. Because her Blue Cross patients received all the care Blue Cross was billed for, Martin argues, the actual loss (and subsequent restitution award) should only have been $31,457—the amount of loss Medicaid suffered from Bayou's fraudulent billing. Revised thusly, the loss amount would have resulted in an offense level of only 14, instead of 20. Together with a Criminal History Category of I, Martin's Guidelines sentence range would have been fifteen to twenty-one months, likely resulting in a sentence lower than the thirty-nine months' imprisonment the district court imposed.

No. 12-31275

The government asks us to affirm the district court's loss calculation and restitution order because "the evidence established that no services were actually rendered."[4]

Section 2B1.1 of the United States Sentencing Guidelines ("U.S.S.G.") increases the offense level of a defendant convicted of fraud based on the actual or intended loss, whichever is greater. U.S.S.G. § 2B1.1 cmt. n.3(A). "Actual loss" is the reasonably foreseeable pecuniary harm that resulted from the offense, while "intended loss" is "the pecuniary harm that was intended to result from the offense." *Id.* The district court need only make a reasonable estimation based upon the available information. *Cothran*, 302 F.3d at 287. The burden is on the government to prove loss by a preponderance of the evidence. *United States v. Nelson*, 732 F.3d 504, 521 (5th Cir. 2013). However, where "the fraud [is] so extensive and pervasive that separating legitimate benefits from fraudulent ones is not reasonably practicable, the burden shifts to the defendant to make a showing that particular amounts are legitimate." *United States v. Hebron*, 684 F.3d 554, 563 (5th Cir. 2012).

At sentencing, the government requested that the district court adopt the PSR's loss calculation of $813,422.50—the total amount Blue Cross paid Martin. The district court rejected the government's argument. It instead found that Blue Cross suffered the lower actual loss figure of $200,853. This number comported with the amount Martin claimed for services rendered on days when she worked at Morehouse General, or when one of her Blue Cross patients was hospitalized. The exact calculation was based on charts

---

[4] The government also argues that this court should review Martin's arguments only for plain error, as Martin did not object below to the amount of loss calculated or the amount of restitution imposed. Because we affirm the district court's sentence, we do not consider this argument, other than to note that Martin, in her objections to the PSR, disputed the loss calculation as to Blue Cross, and, at sentencing, repeatedly made clear that she objected to any finding of loss.

presented by Cowart and Agent Allen.   Pursuant to U.S.S.G. § 2B1.1, the district court imposed a twelve-level enhancement for fraud-based losses of more than $200,000, but less than $400,000.   It then sentenced Martin to thirty-nine months' imprisonment.  The district court also ordered $200,853 in restitution for Blue Cross.

We uphold the district court's loss calculation and restitution order. First, there was no legal error with the method by which the district court reached the $200,853 loss amount.  The district court based this figure on the amount Martin billed Blue Cross for services she herself could not have provided either because she was working at Morehouse General or because a patient was hospitalized.  Martin does not challenge this method of calculation, and we conclude that it bears a reasonable relation to the actual harm of the offense.  *See United States v. Randall*, 157 F.3d 328, 331 (5th Cir. 1998). Second, although Martin does not take issue with the district court's method of calculating loss, she does contend that the calculation was in error because it did not include the value of the services rendered.  In making this argument, Martin does not challenge any particular date on which services were or were not provided.   Instead, she broadly argues that the loss amount, and the restitution award on which it was based, should be zero because her Blue Cross patients received the billed-for care when Martin visited them, before or after her full-time job, or when another LPN did so.

Martin made the same argument, unsuccessfully, in her motions for judgments of acquittal and for a new trial.  The district court observed that

> Martin's nurse notes represented that *she* cared for E.D. on certain dates when Martin was on duty at Morehouse General Hospital. Blue Cross . . . was charged for and paid the claims Martin submitted for E.D.'s care, relying on the records that showed Martin was providing the care.  The evidence did not bear out Martin's theories that another Bayou nurse performed these services for E.D. or that she routinely performed these services

before and after her shifts at the hospital, and the jury was entitled
to reject these theories accordingly.

The district court reached the same conclusion as to Martin's other Blue Cross
patient, C.S.

We find no error in the district court's reasoning. Although a defendant
is entitled to a credit for services she performs, *see United States v. Jones*, 475
F.3d 701, 706 (5th Cir. 2007), Martin's objection to her sentence is simply a
repackaging of the arguments she relies on to challenge the sufficiency of the
evidence supporting her conviction. Just as we have found that evidence
sufficient to uphold her conviction for health care fraud, we similarly conclude
that, in light of all the evidence already discussed, the district court did not err
in rejecting her claims that she or another LPN cared for the Blue Cross
patients. Martin's is not a case in which the government's proposed loss
calculation was based on unsubstantiated claims that particular health care
services were not rendered. *See id.* at 705–07. Here, the district court was
able to rely on the same evidence heard by the jury, which showed that in
signing her name and obtaining an individual provider number, Martin
represented that she personally provided the care described in the nurse notes.
The district court also heard testimony by Agent Allen at sentencing that,
based on the times Martin clocked in and out of work at Morehouse General,
Martin could not have provided all the care listed in the nurse notes.
Accordingly, we hold that Martin has not shown that the district court's loss
calculation of $200,853 was clearly erroneous or misapplied the law. We thus
affirm the district court's sentence.

### III. CONCLUSION

For the aforementioned reasons, we AFFIRM Martin's and Turner's
convictions, and Martin's sentence.