## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-20270

United States Court of Appeals
Fifth Circuit

**FILED**

November 16, 2018

Lyle W. Cayce
Clerk

Consolidated with: 17-20161

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

EARLIE DICKERSON,

Defendant - Appellant

Appeals from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, DENNIS, and COSTA, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This appeal arises from defendant Earlie Dickerson's participation in a scheme to defraud insurance companies by submitting claims for fraudulent chiropractic treatments. Dickerson was convicted of conspiracy and several counts of mail fraud. He challenges his conviction and his sentence. We affirm the district court.

## I.

Defendant Earlie Dickerson managed the Bryan, Texas office of Sanjoh & Associates, a law firm. The firm specialized in representing clients involved

in car accidents. It prepared and submitted claims to insurers on behalf of clients who had been in accidents, then negotiated settlements. The firm's sole attorney, Divine Sanjoh, visited the office every few months to review settlements and receive payment.

At some point between 2004 and 2005, Dickerson and Edward Graham, a Bryan radio disc jockey and wing-shop proprietor, agreed that Graham would open a chiropractic clinic. They agreed that Sanjoh & Associates would refer clients to Graham's clinic, that the clinic would generate bills for chiropractic treatment, the firm would submit them to insurers, and negotiate a settlement. The client, clinic, and firm would divide the proceeds equally.

Dickerson and Graham were not interested in providing effective chiropractic care to Sanjoh & Associates clients. The plan was to generate larger settlements with insurers by fraudulent means. In March 2005, Graham opened the Texas Avenue Chiropractic Clinic immediately next door to the Sanjoh firm's office. Graham invested $15,000 to $16,000 in chiropractic equipment for the clinic, and hired a chiropractor, Olva Ryan, to work there part time. Within months, Ryan left the clinic due to his objections to billing irregularities. He was replaced, and over the next two years Dickerson referred clients to Graham's clinic, insisting that treatment at this particular clinic was necessary for the pursuit of claims. Dickerson openly encouraged clients to visit the clinic as often as possible to increase future settlements. At the clinic, treatment sessions were often carried out by staff untrained and unqualified to practice chiropractic therapy, in some cases risking client injury. Sometimes Dickerson and Graham submitted claims for treatment never done. The clinic would generate "treatment notes" or "daily notes" to evidence appointments or treatments. The Sanjoh firm would then use these notes to support demand letters to insurers. Dickerson would negotiate settlements, dividing the

2

No. 17-20270
c/w 17-20161

payments between the firm, the clinic and client. In early 2007, after another chiropractor quit, Graham and Dickerson recruited chiropractor Chase Lindsey to continue the scheme, periodically relocating equipment and operations to new clinics. The conspirators also involved Marion Young, a former Sanjoh & Associates client, as well as Brittany Jessie, who was Dickerson's assistant at the firm. The scheme was successful. From March 2005 to November 2009, Sanjoh & Associates submitted $5,768,070 in "claims" to 55 insurance companies, receiving $2,140,839.27 from settlements.

Alerted by a tip from a nurse at the clinic, the FBI began investigating in late 2008. In November 2012, a grand jury indicted Dickerson, Graham, Lindsey, Young, and Jessie on one count of conspiracy to commit mail fraud and 30 counts of mail fraud, committed between February 2007 and December 2009. Lindsey, Young, and Jessie reached plea agreements. Graham and Dickerson proceeded to trial.

Young was called to the stand as the Government's first witness in a seven-day joint trial. He testified to Dickerson's participation in the fraudulent scheme based on his experience as a four-time client and chiropractic patient, a collaborator with Dickerson in orchestrating staged accidents, and later an organizer of a sham clinic. Questioned about the terms of his cooperation with the Government, Young testified that he was "hoping" to reduce his sentence, but that he had no "understanding that [he would] get less time in prison" by taking the stand.

The Government called FBI Special Agent Hopp to testify. He testified that he interviewed Graham in December 2009, that Graham then admitted (1) that he had engaged in inaccurate billing, reflecting treatments that had not occurred; (2) that he had generated bills for patients his clinic did not treat; (3) that patients referred to him by Sanjoh & Associates did not appear to be

3

No. 17-20270
c/w 17-20161

injured; (4) that his clinic engaged in improper billing, (5) including overbilling; (6) that he had submitted fraudulent bills to insurers; and (7) that he had brought the issue of overbilling to Dickerson's attention. After hearing the testimony of others, including numerous clients of the clinics, the jury found Dickerson and Graham guilty on all counts of the indictment. Dickerson appeals his conviction.

The presentencing report for Dickerson included information from the United States Attorney's Office, FBI investigators, and National Insurance Crime Bureau investigators. The PSR calculated that in total the conspirators had submitted claims for $5,768,070 to over 50 different insurance companies, resulting in payments totaling $2,140,839.27 in settled claims. The PSR recommended enhancement of the total offense level by four levels due to Dickerson's status as a leader or organizer within a conspiracy involving five or more individuals, by another four levels due to the criminal scheme affecting more than 50 victims, and finally, a further 18 levels due to the $5,768,0700 in "intended losses" attributable to the scheme. The PSR also recommended a restitution order in the amount of $1,192,382.94, equivalent to "actual losses" resulting from the offenses of conviction. The district court adopted the PSR's recommendations over Dickerson's objections, sentencing him to 168 months' imprisonment and ordering restitution of $1,192,382.94, to be paid jointly and severally with his co-conspirators Jessie, Young, and Lindsey, and forfeiture in the same amount[1]

On October 13, 2016, Dickerson filed a pro se motion seeking a new trial on the basis of new evidence, attaching an affidavit of Sylinna Johnson, who

---

[1] When Graham was later sentenced, the district court ordered the same restitution jointly and severally with his four co-conspirators.

No. 17-20270
c/w 17-20161

swore that before Dickerson's trial, Young had told her about an agreement with the Government capping his sentence at five years. As part of this agreement, "if [Young] . . . did not testify against [Dickerson] it would invalidate [his] plea deal." Johnson only shared Young's description with Dickerson after the conclusion of the trial. Dickerson had persuaded Johnson to record Young describing his agreement with the Government, which she did. Johnson also brought to Dickerson's attention a Facebook post in which Young described a plea deal for no more than five years. Both the Facebook post and Johnson's recordings—attached to the Motion—describe a deal with the Government for a five-year sentence, though the speaker in the recording also concedes that the length of the sentence ultimately remained at the discretion of the sentencing court: "the prosecutor . . . he can't even offer you nothing, he can only recommend it . . . it's up to the judge—the judge and the Guidelines." Dickerson argued that his new evidence—affidavit, recordings, and Facebook post—showed that Young had perjured himself; exposure of perjury and Young's incentives to cooperate with the prosecution would have impeached his testimony.

Dickerson requested an evidentiary hearing to examine Young's agreement with the prosecution.[2] The district court denied Dickerson's motion, persuaded that Young's plea agreement included no five-year cap on his sentence—that it could not, because the length of the sentence remained at the court's discretion up to a statutory maximum. The new evidence, it held, failed to demonstrate that Young's trial testimony was false. Dickerson appealed.[3]

---

[2] Dickerson also sought a writ of habeas corpus *ad testificandum* to secure Young's presence at an evidentiary hearing.

[3] On September 19, 2017, we granted an unopposed motion to consolidate Dickerson's appeal of the denial of his motion for a new trial (case number 17-20161) and his appeal of the judgment (case number 17-20270). The United States waived the timeliness

No. 17-20270
c/w 17-20161

## II.

Dickerson's appeal raises four groups of issues. He argues that the district court erred in denying his motion for a new trial and request for an evidentiary hearing. He also challenges the district court's admission of Special Agent Hopp's testimony regarding the admissions of co-defendant Graham, assertedly in violation of the Confrontation Clause of the Sixth Amendment. He then challenges his sentence, arguing the district court misapplied the Sentencing Guidelines in enhancing his offense level, and that the restitution and forfeiture orders were unsubstantiated and improper.

## A.

Dickerson challenges the district court's denial of his motion for a new trial on the basis of new evidence. Under Rule 33, a defendant can move for vacatur of any judgment and for a new trial on the basis of new evidence.[4] Such motions are disfavored and reviewed with great caution.[5] To succeed they must meet the "*Berry* rule conditions": first, the evidence must be newly discovered, unknown to the defendant at the time of trial; second, the failure to detect the evidence must not have been due to a lack of diligence; third, the evidence cannot be merely cumulative or impeaching; fourth, the evidence must be material; and, fifth, if the evidence were introduced at a new trial, the probable result must be an acquittal.[6] Where new evidence indicates that the Government knowingly used false testimony—a *Napue* violation[7]—the fifth

---

requirements with respect to the latter appeal. Federal Rule of Appellate Procedure 4(b)'s time limit for criminal appeals is not jurisdictional, and can be waived. *United States v. Martinez*, 496 F.3d 387, 388 (5th Cir. 2007).

[4] Fed. R. Crim. P. 33.

[5] *United States v. Wall*, 389 F.3d 457, 467 (5th Cir. 2004).

[6] *Id.* at 467 (listing five *Berry* rule factors); *id.* at 473.

[7] *Id.* at 472.

6

condition is not required.[8] We review the district court's denial of a motion for new trial and its denial of a motion for an evidentiary hearing for abuse of discretion.[9]

Dickerson's argument is unclear. At times, it is that Johnson's conversations with Young and Young's Facebook post expose a Government agreement to cap Young's sentence at five years. While the length of Young's sentence was determined by the district court, not the Government, the recording, purportedly of Young, acknowledges this reality. Construed liberally, Dickerson's motion might argue that, in consideration of Young's testimony, the Government would recommend a five-year sentence. Young's plea agreement did provide that the Government would seek a downward departure if it was satisfied with Young's cooperation, but with no mention of a recommended five years. Dickerson replies that the Government ultimately did recommend a five-year sentence when the district court sentenced Young. Yet such a deal—testimony for a recommendation—in any event would not carry his motion.

Dickerson's new evidence contravenes no element of the Government's case; it speaks only to the credibility of Young's testimony. As Dickerson concedes, it is impeachment evidence, failing the third *Berry* rule condition. Young's plea agreement expressly provided that the Government would seek a downward departure if satisfied with Young's cooperation. The new evidence adds nothing of moment.

---

[8] *Id.*

[9] *Id.* at 465 ("A district court's decision to grant or deny a motion for new trial pursuant to Rule 33 is reviewed for an abuse of discretion."); *United States v. Hamilton*, 559 F.2d 1370, 1375 (5th Cir. 1977). (reviewing denial of hearing for abuse of discretion).

No. 17-20270
c/w 17-20161

Hearings under Rule 33 are reserved for "unique situations" typically involving allegations of jury tampering, prosecutorial misconduct, or third-party confession.[10] There was no need for an evidentiary hearing to consider an asserted *Napue* violation, as it could not have changed the outcome: on either track of the *Berry* rule, Dickerson's motion fails. The district court did not abuse its discretion in denying the motion for a new trial and evidentiary hearing.

**B.**

We turn now to Dickerson's challenge to the district court's admission of statements of his non-testifying co-defendant Graham. The Sixth Amendment's Confrontation Clause provides a criminal defendant "the right . . . to be confronted with the witnesses against him,"[11] and to cross-examine these witnesses.[12] In *Bruton v. United States*, the Supreme Court held that a defendant's confrontation right is violated when, during a joint trial, the court admits a non-testifying co-defendant's confession that incriminates the defendant.[13] *Bruton* violations pose a "substantial risk that juries, despite any instructions to the contrary, will improperly use a non-testifying co-defendant's inculpatory statements against the defendant—so powerful is this form of evidence."[14] In *Bruton*, a non-testifying co-defendant's confession facially implicated the defendant in an armed postal robbery.[15] This must be distinguished from a non-testifying co-defendant's admission implicating the defendant in the crime only when taken together with other evidence in the

---

[10] *Hamilton*, 559 F.2d at 1375.

[11] U.S. CONST. amend. VI.

[12] *Richardson v. Marsh*, 481 U.S. 200, 206 (1987).

[13] *United States v. Bruton*, 391 U.S. 123, 126 (1968).

[14] *United States v. Powell*, 732 F.3d 361, 378 (5th Cir. 2013).

[15] *Bruton*, 391 U.S. at 124.

8

trial.[16] Admitting into evidence the admissions of a non-testifying co-defendant that only implicate the defendant when added to other trial evidence is not a *Bruton* violation.[17]

Nor did Dickerson object to the trial testimony of Special Agent Hopp. Our review of the court's admission of this testimony is for plain error.[18] Dickerson must show (1) an error; (2) that was plain; (3) affecting substantial rights; (4) that seriously affects the fairness, integrity or public reputation of judicial proceedings.[19] A *Bruton* violation cannot constitute plain error when the court is "convinced beyond a reasonable doubt" that, in light of other evidence presented at trial, there is no reasonable probability the defendant would be acquitted absent the improper evidence.[20]

Dickerson challenges seven statements in Special Agent Hopp's testimony, each regarding Graham's admissions. The first six of these statements do not facially implicate Dickerson, and speak only to Graham's involvement in fraudulent activity.[21] In the seventh statement, Hopp described Graham's admission that he had "brought . . . to the attention of Earlie Dickerson" "a problem, that patients weren't getting their treatments[,] that [Graham] was aware that there was billing that was not reflecting that that

---

[16] *Richardson*, 481 U.S. at 211 (1987).

[17] *Id.*; *see also United States v. Morales*, 477 F.2d 1309, 1314 n.13 (5th Cir. 1973) (holding that admission of a statement was not a *Bruton* violation where it "does not directly inculpate anyone").

[18] *United States v. Medina-Anicacio*, 325 F.3d 638, 643 (5th Cir. 2003).

[19] *United States v. Garza*, 429 F.3d 165, 169 (5th Cir. 2005).

[20] *Powell*, 732 F.3d at 379.

[21] Dickerson challenges three additional statements from Hopp's testimony for the first time in his reply brief. Arguments regarding these statements are waived. *United States v. Jackson*, 426 F.3d 301, 304 n.2 (5th Cir. 2005) ("Arguments raised for the first time in a reply brief . . . are waived."). Even if they had not been waived, assuming they were *Bruton* violations, the errors would have been harmless given the ample evidence supporting the conviction.

was going out." This statement does not facially implicate Dickerson in criminal activity. It rather describes him learning information that should have alerted him to fraudulent conduct. The other evidence against Dickerson was overwhelming. Olva Ryan, chiropractor at Graham's first clinic, testified to his observation of fraud and quitting as a result of its persistence. Young provided a detailed account of Dickerson's involvement with the chiropractic clinics' operation and billing practices, speaking both as a four-time client and a later co-conspirator. Numerous other clients testified to fraudulent treatments, submission of false claims, and Dickerson's involvement in the scheme. We are "convinced beyond a reasonable doubt" there is no reasonable probability the jury would have acquitted Dickerson in the statement's absence. There was no error, plain or otherwise.

## C.

Dickerson argues that the district court erred in applying the Guidelines. First, Dickerson challenges the district court's decision to enhance his offense level on the basis of his role as an organizer of criminal activity involving five or more participants. Second, Dickerson argues that the district court erred in enhancing his offense level by 18 and 4 levels on the basis of its calculation that his fraud involved a loss of more than $2.5 million and 50 or more victims. Dickerson raised these issues at sentencing, and we review the factual findings for clear error.[22]

---

[22] *United States v. Cabrera*, 288 F.3d 163, 173 (5th Cir. 2002) ("The district court's determination that a defendant was a leader or organizer under subsection 3B1.1(a) is a factual finding that this court reviews for clear error."); *United States v. Scher*, 601 F.3d 408, 412 (5th Cir. 2010) ("A district court's loss calculation under the Sentencing Guidelines is a factual finding reviewed for clear error."); *United States v. Brooks*, 681 F.3d 678, 715 (5th Cir. 2012) (reviewing district court's finding that scheme involved fifty or more victims for clear error).

No. 17-20270
c/w 17-20161

**1.**

Under the Guidelines, the district court must increase a defendant's offense level by 4 levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."[23] To trigger the enhancement, the defendant need only "have been the organizer, leader, manager, or supervisor of one or more other participants,"[24] and need not have supervised or organized all five participants in the criminal enterprise. A "participant" is a "person who is criminally responsible for the commission of the offense, but need not have been convicted."[25] The district court is "free to count the defendant himself as one 'participant' in the criminal transaction."[26]

Here, the evidence supports Dickerson's role as organizer. He recruited accomplices and organized a series of sham chiropractic clinics; orchestrated clients' "treatments" at these clinics; arranged the submission of false insurance claims on their behalf; and negotiated their settlement. His scheme involved at least five participants, some of whom he supervised. First, the district court was free to count Dickerson as one participant in the criminal transaction. Second, Dickerson supervised Brittany Jessie, his assistant at the Sanjoh firm, who assisted in preparation of fraudulent demand letters. Third, Lindsey worked as the chiropractic practitioner, aware that he was facilitating fraudulent billing. Fourth, Young opened a clinic at Dickerson's request and otherwise advanced the scheme via referrals and staging of accidents. Fifth, Graham participated, establishing clinics and engaging in fraudulent billing.

---

[23] U.S.S.G. § 3B1.1(a) (2013).

[24] *Id.* § 3B1.1, cmt. n.2.

[25] *Id.* § 3B1.1, cmt. n.1.

[26] *United States v. Barbontin*, 907 F.2d 1494, 1498 (5th Cir. 1990).

11

No. 17-20270
c/w 17-20161

We find no error in the district court's enhancement on the basis of Dickerson's role as organizer of a criminal enterprise of five participants.

**2.**

Under the 2013 Guidelines, the district court must increase a defendant's offense level by 18 levels when the offense involves a loss of more than $2,500,000, but not more than $7,000,000.[27] The district court must also increase the offense level by four levels if the offense involved 50 or more victims.[28] Loss under the Guidelines "is the greater of actual loss or intended loss."[29] In calculating loss for sentencing enhancement purposes, the district court looks to all criminal acts that were "part of the same course of conduct or common scheme or plan as the offense of conviction," including acts beyond the specific offenses of conviction.[30] "The court need only make a reasonable estimate of the loss."[31] It is entitled to rely upon information in the PSR as long as the information bears some indicia of reliability,[32] for example, when it is based on a law-enforcement investigation.[33] "The defendant bears the burden of presenting rebuttal evidence to demonstrate that the information in the PSR is inaccurate or materially untrue."[34] Presenting plausible arguments will not carry the burden.[35]

The district court's loss calculation is a "reasonable estimate." The district court relied on the PSR's quantification of intended losses, specifically

---

[27] U.S.S.G. § 2B1.1(b)(1)(J) (2013).
[28] *Id.* § 2B1.1(b)(2).
[29] *Id.* § 2B1.1, cmt.3(A).
[30] *Id.* § 1B1.3(a)(2).
[31] *Id.* § 2B1.1 cmt. 3(C).
[32] *Scher*, 601 F.3d at 413.
[33] *United States v. Vela*, 927 F.2d 197, 201 (5th Cir. 1991).
[34] *Scher*, 601 F.3d at 413.
[35] *Id.* at 413–14.

No. 17-20270
c/w 17-20161

that between 2007 and 2009 Dickerson submitted $3,400,950 in claims, that prior to the acts for which Dickerson was convicted, from 2005 to 2007 he submitted another $2,367,120 in claims as part of the same criminal scheme. The PSR stated that in total the scheme had intended losses of $5,768,070, in connection with over fifty victims. These figures had the indicia of reliability, as they were adopted from the FBI's direct investigation of the conspiracy, as well as the FBI's review of information gathered by investigators at the National Insurance Crime Bureau.[36]

Dickerson challenges the enhancements in two ways. First, he argues that the loss calculation and enumeration of victims improperly included losses and victims associated with acts beyond the offenses of conviction. This contention fails. In calculating losses for sentencing enhancement purposes, the district court looks to all criminal acts "part of the same course of conduct or common scheme or plan as the offense of conviction."[37] Dickerson also argues the PSR posits an inaccurate equivalence between intended losses and the totality of conspirators' submitted claims. Dickerson argues that some portion of the claims were unconnected to fraudulent conduct and should not have been counted as losses attributable to fraud. But this plausible argument was not supported by evidence.[38] Dickerson provides none to rebut the PSR. We find no error in the district court's enhancement on the basis of loss and number of victims.

---

[36] *Vela*, 927 F.2d at 201.

[37] U.S.S.G. § 1B1.3(a)(1)(A). Dickerson's reliance on *United State v. Benns* is mistaken. *Benns* stands for the requirement that actual losses must be tied to criminal—as opposed to non-criminal—acts within a common scheme. 740 F.3d 370, 375 (5th Cir. 2014) ("Only conduct that is criminal may be used as 'relevant conduct' to determine a defendant's offense level").

[38] *Scher*, 601 F.3d at 413–14.

No. 17-20270
c/w 17-20161

**3.**

Addressing both of the district court's enhancement determinations, Dickerson raises differences between his and his co-defendant Graham's cases. While the district court found that Dickerson's criminal activity involved at least five participants, including Dickerson and Graham, when sentencing Graham two months later, it also found that Graham's criminal activity involved fewer than five people, refusing to count Dickerson and Graham as participants. Similarly, the district court was not evenhanded in quantifying the total loss for enhancement purposes: with Dickerson, it calculated an intended loss of $5,768,070, in connection with over fifty victims; with Graham, it found a lower loss figure, and fewer than fifty victims. The difficulty with Dickerson's argument is that any mistake here redounded to the benefit of a co-defendant, and did not injure him. The differences between the two sentencings do not change our finding of no error in the district court's application of the Guidelines.

**D.**

Dickerson finally challenges the district court's restitution and forfeiture orders, repeating an objection made at his sentencing that the orders were based on insufficient evidence, and should have accounted for legitimate claims intertwined with the fraudulent ones. Under the Mandatory Victim Restitution Act, the district court must award restitution to victims "directly and proximately harmed" by a defendant's offense.[39] Restitution cannot exceed actual losses.[40] When sentencing a defendant for mail fraud, the district court is also obligated to order forfeiture of any proceeds obtained from the fraud.[41]

---

[39] 18 U.S.C. § 3663A.
[40] *United States v. Sharma*, 703 F.3d 318, 323 (5th Cir. 2012).
[41] 18 U.S.C. § 982(a)(2).

14

No. 17-20270
c/w 17-20161

"In making its factual findings for sentencing, a district court may adopt the findings of the PSR without additional inquiry if those facts have an evidentiary basis with sufficient indicia of reliability and the defendant does not present rebuttal evidence or otherwise demonstrate that the information is materially unreliable."[42] The Government bears the burden to establish amounts for restitution and forfeiture,[43] at which point the burden shifts to the defendant to prove the inaccuracy of the loss calculation.[44] Where the defendant has preserved the argument at the district court, we review the quantum of a restitution award for abuse of discretion.[45]

The district court calculated restitution of $1,192,382.94 relying on the PSR's analysis of actual losses, and ordered forfeiture in the same amount. The PSR's actual loss analysis was presented in a systematic and detailed set of tables, relating the claims submitted by conspirators to individual insurers and the corresponding settlements paid.[46] As with other information in the PSR, the inputs were acquired from the FBI's case file and from victim insurers. The PSR's methodical reconstruction of the numbers involved in the offenses of conviction bears the requisite indicia of reliability. Dickerson's argument about hypothetical bona fide treatments provides no evidence to cast doubt on the PSR's analysis. The Government established actual losses, and Dickerson has

---

[42] *United States v. Valles*, 484 F.3d 745, 759 (5th Cir. 2007); Fed. R. Crim. P. 32.2(b)(1) (requiring reliance on record evidence and or other relevant and reliable information in issuing forfeiture order).

[43] *Sharma*, 703 F.3d at 325; Fed. R. Crim. P. 32.2(b)(1) (requiring the Government to "establish[] the requisite nexus between the property and the offense").

[44] *Valles*, 484 F.3d at 759–60; *Sharma*, 703 F.3d at 325–26.

[45] *United States v. De Leon*, 728 F.3d 500, 507 (5th Cir. 2013).

[46] The PSR includes an error, listing at places recommended restitution sums that differ by $500. The error does not undermine the reliability of the PSR or its underlying data.

No. 17-20270
c/w 17-20161

not moved his burden to contravene its analysis. We find no abuse of discretion in the district court's restitution and forfeiture orders.

## III.

For the reasons stated above, we AFFIRM the district court.