# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 4, 2020

Lyle W. Cayce
Clerk

No. 19-50891

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

WILLIAM JOSEPH DUBIN,

*Defendant—Appellant*,

CONSOLIDATED WITH

No. 19-50912

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

DAVID FOX DUBIN,

*Defendant—Appellant*.

No. 19-50891

---

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:17-CR-227-1
USDC No. 1:17-CR-227-2

---

Before Barksdale, Elrod, and Ho, *Circuit Judges*.

Rhesa Hawkins Barksdale, *Circuit Judge*:

William Joseph Dubin and David Fox Dubin were convicted on charges arising from a scheme to defraud Texas' Medicaid program. Between them, they raise eight issues: sufficiency of the evidence for their convictions; running of the statute of limitations based on the superseding indictment; restitution and forfeiture amounts; and William Dubin's length of sentence. An issue of first impression for our court is whether David Dubin's fraudulently billing Medicaid for services not rendered constitutes an illegal "use" of "a means of identification of another person", in violation of 18 U.S.C. § 1028A. AFFIRMED.

## I.

William Dubin was a licensed psychologist in Texas, and formed "Psychological A.R.T.S., P.C." (PARTS), in Austin, Texas, for his psychology practice. He served as its chief officer and director. His son, David Dubin, later began working for PARTS on the business side of the corporation, and provided no psychological services.

PARTS is an enrolled Medicaid provider and, as such, agreed to comply with Medicaid laws and regulations. Texas' Medicaid program provides, *inter alia*, funding for psychological evaluations of children within Texas' emergency-shelter system. In that regard, McKenzie served as the

president of the board of directors of Williams House, an emergency youth shelter located approximately 80 miles from Austin.  As a part of its operations, Williams House arranged for mental-health assessments and psychological evaluations at the shelter.

Former PARTS office manager King testified at trial that, between January and March 2011, McKenzie and William Dubin discussed an opportunity for PARTS to conduct evaluations at Williams House.  The email discussion concluded with William Dubin's offering McKenzie "10% off the top of the first year's gross income from this project".  After the discussions, PARTS began to send its employees and clinicians to Williams House and billed Medicaid for the work, as well as paying ten percent of the gross income to McKenzie.

PARTS employees performed intake interviews and psychological evaluations at Williams House.  To receive Medicaid reimbursement for the work, PARTS had to certify whether a licensed psychologist performed it. Work performed by a licensed psychologist had a higher Medicaid reimbursement rate than that performed by other clinicians.  At trial, King testified that she explained billing procedures and requirements to William Dubin, but that he insisted that PARTS bill at the higher rate, despite services not being performed by a licensed psychologist.

In April 2011, William Dubin directed King to pay McKenzie ten percent, in advance, of the amount estimated to be billed to Medicaid for the upcoming month.  One group of evaluations that stemmed from Williams House was largely performed by a non-licensed psychologist.  But, PARTS billed Medicaid for those evaluations as if they had been performed by a licensed psychologist.

Eventually, McKenzie received a contract providing $50 per hour for his referral services as an independent contractor.  The contract purportedly

served as a means to provide McKenzie with an above-board role for which he could be paid for his referrals. Based on time cards he submitted, McKenzie would be paid $50 per hour for referrals; but, the rate was not a "real number". Along this line, McKenzie routinely failed to submit time cards or other estimates of time spent under this contract. Instead, King devised a method to calculate McKenzie's hours after-the-fact. She calculated ten percent of the gross amount reimbursed by Medicaid for Williams House patients, divided it by McKenzie's contract hourly rate of $50, and entered the resulting number as McKenzie's hours worked. This ten-percent calculation practice continued after King left PARTS in December 2011. After a PARTS employee resigned, she provided the calculation material to the Texas Attorney General.

Townsend worked as a biller at PARTS, reporting to David Dubin. Townsend billed Medicaid for PARTS' services rendered. David Dubin and Townsend discussed PARTS' billing procedures, and he instructed her to bill Medicaid for the licensed-professional rate, despite this being a violation of Medicaid rules because some services were performed by students or interns, and were, therefore, ineligible for reimbursement.

Medicaid rules limit the number of billable hours per patient. After a conversation with David Dubin, Townsend frequently received his questions about how many hours remained for a patient, and she was often instructed to add hours to a patient's record after the patient had been examined and PARTS had billed for reimbursement. In one instance, Townsend was asked to add three hours of bills as "corrected claims" for 19 previously seen patients. These added-claims generated additional payments from Medicaid.

David Dubin similarly instructed Townsend's replacement, Gordon, to continue these practices, and included additional instructions for Gordon

to work around other Medicaid limits.  David Dubin told Gordon to bill the maximum of eight hours regardless of whether they had been performed.

After receiving a tip, Texas' Medicaid Fraud unit inquired into PARTS' billing practices.  After receiving patient files and communications related to PARTS' billing procedures, it was revealed that PARTS billed for services provided by a licensed psychologist and received by 300 patients totaling 1,896 hours, although those services were not performed by a licensed psychologist.

William Dubin, David Dubin, and McKenzie were charged in June 2017 for, *inter alia*, violating:  18 U.S.C. §§ 2 (aiding and abetting); 1349 (conspiracy to commit health-care fraud); 1347 (health-care fraud); 1028A (aggravated identity theft); 371 (conspiracy to violate 42 U.S.C. §§ 1320a-7b (b)(1) and (2)); and 42 U.S.C. §§ 1320a-7b (b)(1) and (2) (soliciting or receiving illegal remuneration and offering to pay illegal remuneration).  The superseding indictment in September 2018 did not include earlier charges against McKenzie; he pleaded guilty prior to the Dubins' trial.

Trial began on 9 October 2018 and ended on the 26th.  William and David Dubin testified.

For the 25 counts against him, William Dubin was convicted on three: count one, violating 18 U.S.C. § 371 (conspiracy to pay and receive health-care kickbacks); and counts nine and ten, violating 42 U.S.C. § 1320a-7b(b)(2) (offering to pay, and paying, illegal remuneration for Patients C (count nine) and D (count ten)).  For the 25 counts against him, David Dubin was convicted on three:  count twelve, violating 18 U.S.C. § 1349 (conspiracy to commit health-care fraud); count nineteen, violating 18 U.S.C. §§ 2, 1347 (aiding and abetting and health-care fraud for Patient L); and, count twenty-five, violating 18 U.S.C. §§ 2, 1028A (aiding and abetting and aggravated identity theft for Patient L).

At sentencing, the court adopted the presentence investigation report (PSR), as modified, for William Dubin and imposed, *inter alia*: five years' probation; restitution of $61,230; and forfeiture in the same amount. For David Dubin, the court adopted the PSR, as modified, and imposed, *inter alia*: imprisonment of twelve months and one day for counts twelve and nineteen; two years' imprisonment for count twenty-five; restitution of $282,019.92; and forfeiture of $94,006.64.

## II.

David Dubin claims the superseding indictment substantially amended the charges so that the statute of limitations had run. Both defendants challenge: the sufficiency of the evidence for their convictions; and the restitution and forfeiture amounts. And, William Dubin challenges the length of his sentence. Each challenge fails.

## A.

For counts nineteen and twenty-five, David Dubin asserts the Government's amended indictment substantially altered the charges such that the superseding indictment may not revert back, and thus the two counts were time-barred. If so, his sufficiency-of-the-evidence challenges become moot because the statute ran, and those two convictions would be vacated. Essentially, if David Dubin's assertions are correct on this issue, he is also without a charge for his third conviction, on count twelve.

David Dubin failed, however, to raise this statute-of-limitations defense until in a post-trial motion for ineffective assistance of counsel, filed by his trial counsel, that admitted as much. His appellate counsel (different from trial counsel) acknowledged this at oral argument. Failure to raise this issue until post-trial waives it. *United States v. Lewis*, 774 F.3d 837, 845 (5th Cir. 2014) (holding criminal defendant must raise statute-of-limitations issue

at trial, and defendant waives the defense if raised for first time in post-trial motion).

## B.

For William and David Dubin's sufficiency-of-the-evidence challenges for their convictions, if defendant timely moves for judgment of acquittal, as in this instance, the preserved challenge is reviewed *de novo*. *E.g.*, *United States v. Oti*, 872 F.3d 678, 686 (5th Cir. 2017) (citation omitted). Such review "is highly deferential to the verdict" and "consider[s] the evidence in the light most favorable to the [G]overnment, with all reasonable inferences and credibility determinations made in [its] favor". *Id.* (internal quotation marks and citations omitted). For that review, "[t]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt". *Id.* (emphasis in original) (citation omitted). In that regard, "it [is] within the sole province of the jury as the fact finder to decide the credibility of the witnesses and to choose among reasonable constructions of evidence"; accordingly, "[w]e will not second guess the jury in its choice of which witnesses to believe". *United States v. Zuniga*, 18 F.3d 1254, 1260 (5th Cir. 1994) (citations omitted). Among the evidence the jury considered was the Dubins' trial testimony. The jury, as a result, was able to weigh this testimony against the evidence offered by the Government.

### 1.

David Dubin's sufficiency challenges are addressed first. We then turn to William Dubin's.

#### a.

David Dubin challenges his conviction on count twelve for conspiracy to commit health-care fraud, in violation of 18 U.S.C. §§ 1347, 1349. Again, a conviction is affirmed unless no rational juror could have convicted defendant. *United States v. Gonzalez*, 907 F.3d 869, 873 (5th Cir. 2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Conspiracy to commit health-care fraud requires the Government to show beyond a reasonable doubt: "(1) two or more persons made an agreement to commit health care fraud; (2) . . . defendant knew the unlawful purpose of the agreement; and (3) . . . defendant joined in the agreement with the intent to further the unlawful purpose". *United States v. Sanders*, 952 F.3d 263, 273 (5th Cir. 2020) (quoting *United States v. Ganji*, 880 F.3d 760, 767 (5th Cir. 2018)).

David Dubin's sufficiency challenges are based on his being acquitted on other health-care-fraud counts, and his assertion that, therefore, the only evidence that can be considered to support a conviction for conspiracy to commit such fraud is the evidence for his three counts of conviction: twelve, nineteen, and twenty-five. Further, he contends there is no Medicaid 12-month-cycle that he could violate under this scheme. In doing so, he discusses his theory of the Government's case: bills for Patient L, whose examination and billings the Government used to charge David Dubin on count twelve, were held in abeyance until a later date to avoid a Medicaid rule proscribing multiple billings in a 12-month-cycle; and, because he forced PARTS' billing team to hold Patient L's reimbursements, he purposefully avoided the rule, and therefore committed health-care fraud. His claim relies, however, on there being no 12-month rule, and accordingly he could not violate it.

But, the conviction does not hinge on whether there is a 12-month-cycle. David Dubin's conviction is valid, regardless of whether the crime was completed, if he entered into *any* scheme to defraud, including a scheme to bill Medicaid for services not provided.

No. 19-50891

The superseding indictment charged him with, *inter alia*, conspiracy to defraud Medicaid under 18 U.S.C. § 1349. Significant evidence established the elements of conspiracy, showing David Dubin's: direction of licensed psychological associates (a post-doctoral associate position requiring licensure by the Texas Behavioral Health Council; not equivalent to a licensed psychologist) and unlicensed students to conduct psychological tests on behalf of PARTS; submitting bills to Medicaid with improper modifiers to obtain a higher reimbursement rate; and, directing tests not to be supervised as required.

The evidence established a valid basis for conviction on conspiracy to commit health-care fraud. As discussed, we cannot reconsider the weight of the evidence or attempt to balance the credibility of witnesses—that task is "the sole province of the jury". *United States v. Hernandez-Palacios*, 838 F.2d 1346, 1350 (5th Cir. 1988); *see also United States v. Duvall*, 846 F.2d 966, 975 (5th Cir. 1988) ("It is not possible, or even proper for us to speculate about the basis of the jury's decision."). David Dubin's attempt to exclude evidence on other counts for which the jury returned not-guilty verdicts is similarly unavailing. Not-guilty verdicts may not be used to attack the evidence supporting a guilty verdict. *United States v. Powell*, 469 U.S. 57, 66 (1984) ("We also reject, as imprudent and unworkable, a rule that would allow criminal defendants to challenge inconsistent verdicts on the ground that in their case the verdict was not the product of lenity, but of some error that worked against them.").

b.

In challenging his conviction on count twenty-five for aggravated identity theft and aiding and abetting, in violation of 18 U.S.C. §§ 2 and 1028A, David Dubin claims his acts did not constitute "use" within the meaning of the statute. The identity-theft statute requires a two-year

sentence for "[w]hoever . . . knowingly transfers, possesses, or *uses*, without lawful authority, a means of identification of another person" during the commission of an enumerated felony.  18 U.S.C. § 1028A(a)(1) (emphasis added).  The statute stacks the two-year sentence with any sentence arising from an enumerated felony, which includes health-care fraud, in violation of 18 U.S.C. § 1347.  *See* 18 U.S.C. § 1028A(c)(5).

Our court has not previously considered the definition of "use" pursuant to the identity-theft statute, § 1028A.  It has, however, considered whether a person acted "without lawful authority" under that statute. *See United States v. Mahmood*, 820 F.3d 177, 187 (5th Cir. 2016).  Looking to the plain language of the statute, our court held it "proscribes the . . . use of another person's means of identification, absent the right or permission to act on that person's behalf in a way that is not contrary to the law". *Id.* at 188 (citing *United States v. Osuna-Alvarez*, 788 F.3d 1183, 1186 (9th Cir. 2015) (alteration in original) ("[I]llegal use of the means of identification alone violates § 1028A."); *United States v. Ozuna-Cabrera*, 663 F.3d 496, 499 (1st Cir. 2011) ("[R]egardless of how the means of identification is actually obtained, if its subsequent use breaks the law—specifically, during and in relation to the commission of a crime enumerated in subsection (c)—it is violative of § 1028A(a)(1).")).

In claiming he did not "use" the identity of another in the commission of the health-care fraud, David Dubin does not claim he had *lawful authority to use* the identities of patients that comprised the health-care fraud.  Re-stated, he claims only that he did not *use* those identities.  In doing so, he relies upon *United States v. Medlock*, 792 F.3d 700 (6th Cir. 2015), and contends, under that decision's holding on "use", he cannot be convicted under the identity-theft statute.  Notably, the court first looked to the plain meaning of the word to hold that "use" means, *inter alia*, to avail oneself of. *Id.* at 705–06.  But *Medlock*'s holding is also based in part on a prior decision's

defining "use" in the identity-theft statute, various canons of construction, and the Sixth Circuit's Pattern Jury Instructions "contemplat[ing] a narrow reading of 'use'". *Id.* at 706. The "use" in *Medlock* turned on what kind of service defendants provided, and whether they overbilled for services. *Id.* at 709. We do not accept *Medlock's* definition.

As we did in *Mahmood*, we look to the plain language of the statute. We hold the plain meaning of "use" answers the question at issue: whether David Dubin "use[d]" the means of identification of another, without lawful authority, to violate § 1028A. The plain meaning of "use" is: "take, hold, or deploy (something) as a means of accomplishing a purpose or achieving a result; employ: [as in] 'she used her key to open the front door'", *Oxford Dictionary of English* (3d ed. 2010); and, "to employ for the accomplishment of some purpose" and "to avail oneself of", *Black's Law Dictionary* (10th ed. 2014). 913 F.3d at 1334. In short, deciding whether a person "use[d]" something seems to be a relatively straightforward yes or no, despite David Dubin's contention to the contrary. Although David Dubin urges our adopting the holding on "use" from *Medlock*, the facts of this case do not fit squarely into the holding or facts of *Medlock*. There defendants, who operated a non-emergency ambulance company that transported Medicare patients to certain medical appointments, ultimately provided the transportation service but falsely stated that stretchers were required for transport. *Medlock*, 792 F.3d at 703–05. In contrast, Patient L did not receive services. While Patient L did undergo psychological testing by a psychological associate, there was no clinical interview, evaluation, or report provided to the shelter that assessed the patient's needs or made any recommendations with respect to the best program or treatment for the patient. ROA.19-50912.3151-57, 3958-59.

Furthermore, the sixth circuit, in two subsequent cases, took different approaches to "use" than it did in *Medlock*, one of which was a health-care

fraud/identity-theft case, *United States v. Michael*, 882 F.3d 624 (6th Cir. 2018). *See also United States v. White*, 846 F.3d 170 (6th Cir. 2017). Both cases provide a slightly different definition of "use" than what David Dubin urges our adopting and are more compatible with the issue at hand. *Michael* does, it is true, cite *Medlock* favorably, but only insofar as "[t]he definition[] noted in . . . *Medlock* cover[s] the conduct alleged in this case." *Michael*, 882 F.3d at 628. It does not, however, explicitly adopt *Medlock*'s definition. *Michael* also favorably cites *White*, which "rejected a cramped reading of 'uses[.]'" *Id.*

The eleventh circuit also addressed the definition of "use" under the identity-theft statute, holding that the plain, ordinary meaning of the statute resolves the question. *United States v. Munksgard*, 913 F.3d 1327, 1334 (11th Cir. 2019) (citing *Michael*, 882 F.3d at 628). *Munksgard* confronted circumstances similar to those in this case, albeit bank fraud's being the predicate offense. *Id.* at 1333. There, defendant admitted he acted "without lawful authority", there was an enumerated predicate felony, and there was no dispute whether defendant used a "means of identification". *Id.* at 1333–34. Holding that the plain meaning of "use" resolved whether defendant "use[d]" a means of identification, the court held defendant had violated the statute. *Id.* at 1334. Simply put, "to use an object is [t]o convert [it] to one's service; to avail oneself of [it]; to employ [it]; as, to use a plow, a chair, a book". *Id.* (citing *Webster's Second New International Dictionary* 2806 (1944)).

Consistent with the plain meaning of "use", the statute operates simply as a two-part question to determine criminal conduct: did defendant use a means of identification; and, was that use either "without lawful authority" or beyond the scope of the authority given? Our court's opinion in *Mahmood* alludes to this approach. *See Mahmood*, 820 F.3d at 187–90 ("the statute plainly applies to circumstances like these, where [defendant] gained

access to his patients' identifying information lawfully, but then proceeded to use that information unlawfully and in excess of his patients' permission").

Pursuant to that two-part standard, David Dubin "use[d]" the means of identification of the patients; and he did so without their lawful authority, as well as in a manner beyond the scope of their lawful authority. At oral argument here, David Dubin's counsel admitted as much by noting that resolution of this question is ultimately a scope-of-authority issue.

Patient L's means of identification—the patient's Medicaid reimbursement number—was used, or employed, by David Dubin in the reimbursement submissions to Medicaid. Based upon the records provided to Medicaid for reimbursement, David Dubin asserted Patient L received services that he did not receive. Needless to say, in order to be eligible for Medicaid reimbursement as submitted, the services provided to Patient L had to have been performed as submitted. PARTS submitted Patient L's information for reimbursement as having been performed by a licensed psychologist; instead, it was only partially performed by a licensed psychological associate, as defined *supra*. Patient L was never interviewed, despite PARTS' usual procedure, and David Dubin instructed the psychological associate that performed some of the services to cease evaluation of the patient, yet David Dubin submitted the evaluations as though they had been completed. Effectively, part performance of the psychological services rendered them illusory, but David Dubin billed Medicaid for a completed service.

Applying these facts to our two-part standard for the statute: David Dubin "use[d]" means of identification when he took the affirmative acts in the health-care fraud, such as his submission for reimbursement of Patient L's incomplete testing; he used the means of identification. Next, David

Dubin does not dispute he had no lawful authority to submit these tests for reimbursement, like the defendant in *Mahmood*. 820 F.3d at 189. In short, David Dubin "use[d]" Patient L's means of identification "without lawful authority" under § 1028A.

2.

Turning to William Dubin, he challenges the sufficiency of the evidence for: his conviction of conspiracy to pay and receive health-care kickbacks, in violation of 18 U.S.C. § 371 and 42 U.S.C. § 1320a (count one); and, his convictions for offering to pay, and paying, illegal remunerations, in violation of 42 U.S.C. § 1320a-7b(b)(2) (counts nine and ten).

a.

Regarding his conviction on count one—conspiracy to pay and receive health-care kickbacks—the statute criminalizes: "knowingly and willfully giv[ing] or receiv[ing] a benefit for referring a party to a health care provider for services paid for by a federal health care program". *United States v. Sanjar*, 876 F.3d 725, 746 (5th Cir. 2017). A conspiracy to violate the health-care kickback statute requires "an agreement to do so, knowing and voluntary participation in the conspiracy, and an overt act by one member in furtherance of the unlawful goal". *United States v. Gevorgyan*, 886 F.3d 450, 454 (5th Cir. 2018) (citation and quotation omitted).

William Dubin primarily attacks the evidence by asserting: his co-conspirator, McKenzie, had no power to control patients' receiving PARTS' care; and, therefore, the co-conspirator could not refer patients in violation of the statute. He also claims he lacked the requisite intent under the statute: the Government had to show he intended to gain undue influence over the reasoning of another person; and it failed to do so. *See United States v. Miles*, 360 F.3d 472, 477–78 (5th Cir. 2004). Finally, he asserts that, because

McKenzie was paid *after* the services were rendered to patients, the payments to him could not have been to induce the services.

The Government presented evidence from former PARTS employees regarding William Dubin's agreement with McKenzie to provide him a ten-percent fee for patients referred to PARTS by Williams House. Emails described the relationship between them as a fee-for-referral arrangement, and the two outlined their arrangement in a contract that provided for McKenzie's being paid $50 an hour. But, the Government presented testimony undermining that hourly rate. William Dubin emailed McKenzie about the "opportunity" previously offered, reiterating that, under their agreement, McKenzie would receive "10% off the top of the first year's gross income from this project".

As discussed *supra*, once PARTS began working with the Williams House patients, William Dubin directed McKenzie's fees to be calculated after-the-fact, so they would consistently add up to ten percent of PARTS' reimbursements for patients from Williams House. And as also discussed, because McKenzie rarely submitted time sheets, the PARTS administrative assistant, King, calculated ten percent of the Williams House patient-payments from Medicaid, and then McKenzie's hours "worked" was calculated to reflect the ten percent he was owed. The primary PARTS employee calculating McKenzie's fee left PARTS during the scheme, but trained her replacement to continue carrying it out. According to King's testimony, William Dubin admitted it was "unethical for [PARTS] to pay somebody for referrals, so we needed to show it as an hourly rate".

William Dubin's reading of *Miles* ignores a critical fact pattern that violates the kickback statute: "payments to a [party] based on the number of patients that he signed up with the service". 360 F.3d at 480. As in *Miles*,

15

No. 19-50891

William Dubin and PARTS paid McKenzie based on the number of patients referred.

b.

Concerning William Dubin's convictions on counts nine and ten for offering to pay, and paying, illegal remunerations, in violation of 42 U.S.C. § 1320a-7b(b)(2), the Government was required to show defendant, beyond a reasonable doubt: knowingly and willfully offered to pay, or paid, any remuneration to any person; to induce that person; to refer anyone for a service eligible for payment under a federal health-care program, or to arrange for the furnishing of such a service. *See* 18 U.S.C. § 1320a-7b(b)(2)(A). As with his conspiracy conviction in count one, William Dubin claims the jury ignored evidence that McKenzie could not assert control over the Williams House patients. He also claims: Williams House's remote location necessarily limited which psychological providers were willing to provide services, so the relationship between PARTS and Williams House was out of necessity and was not an illegal remuneration scheme.

This sufficiency challenge improperly asks our court to reweigh the evidence presented to the jury and hold it was legally impossible for him to induce McKenzie to refer patients, or that the payments to McKenzie were not remunerations under the statute. As discussed *supra*, the payments constituted health-care kickbacks under the statute.

Regarding whether William Dubin could not induce McKenzie to refer patients, the Government presented evidence to show William Dubin did so: McKenzie's role as an executive in the decision-making process at Williams House; his updating on the "99% probability that [he] can get [PARTS patients] in to the emergency shelter for testing"; and, William Dubin's emphasizing to PARTS staff the need to keep McKenzie happy in order to "keep getting referrals". This evidence could reasonably describe a

16

relationship by which McKenzie had the power and ability to provide PARTS with access, and William Dubin sought to ensure that continued.

C.

With evidence sufficient for each of the convictions, we turn to the Dubins' challenges to restitution and forfeiture. Both use the same theories to challenge the district court's calculation of each.

1.

The legality of a restitution award is reviewed *de novo*; if legally permitted, the amount ($61,230 for William, and $282,019.92 for David, Dubin) is reviewed for abuse of discretion. *United States v. Cothran*, 302 F.3d 279, 288 (5th Cir. 2002). Along that line, the Mandatory Victims Restitution Act of 1996 requires defendant to pay restitution to the victim in a property-loss case. 18 U.S.C. § 3663A. When the underlying offense of conviction is fraud, the court may award restitution for actions taken as part of the scheme. *Cothran*, 302 F.3d at 289 ("[W]here a fraudulent scheme is an element of the conviction, the court may award restitution for 'actions pursuant to that scheme'". (quoting *United States v. Stouffer*, 986 F.2d 916, 928 (5th Cir. 1993))).

For the Dubins' crimes, the victim is the Government, *vis-à-vis* Texas' Medicaid program, which receives funding from the United States Department of Health and Human Services. *See*, *e.g.*, *United States v. Jones*, 664 F.3d 966, 984 (5th Cir. 2011); *see also Mahmood*, 820 F.3d at 193 ("We must consider that Medicare is the victim of [the] fraud . . . ."). Restitution awards are limited "to the actual loss directly and proximately caused by . . . defendant's offense of conviction". *Mahmood*, 820 F.3d at 196 (citation omitted). In calculating loss amounts for purposes of restitution, the Government bears the burden to demonstrate the loss. *See* 18 U.S.C. § 3664(e); *see also Mahmood*, 820 F.3d at 196. The burden then shifts, and "a

defendant, to be entitled to an offset against an actual loss amount for purposes of restitution, must establish (1) 'that the services . . . were legitimate' and (2) 'that Medicare would have paid for those services but for his fraud'". *United States v. Mathew*, 916 F.3d 510, 521 (5th Cir. 2019) (quoting *Mahmood*, 820 F.3d at 194); *see also United States v. Ricard*, 922 F.3d 639, 659 (5th Cir. 2019) ("The defendant meets this burden by establishing '(1) that the services [he provided to Medicare beneficiaries] were legitimate' and (2) 'that Medicare would have paid for those services but for his fraud'") (quoting *Mathew*, 916 F.3d at 521 (alteration in original)).

The Dubins claim our court's recent decision in *Ricard* entitles them to an offset calculated at actual value of services provided. *See* 922 F.3d at 658–59. *Ricard* and *Mahmood*, they assert, require deducting the amount Medicaid would have paid, but-for the fraud. *See Ricard*, 922 F.3d at 659–60; *see also Mahmood*, 820 F.3d at 196.

But the Dubins have the burden to satisfy both prongs of the standard set out in *Mahmood*, and they fail on both fronts. 820 F.3d at 194. At sentencing, the Dubins claimed the services provided by PARTS "were valuable to those . . . to whom they were provided" and, as a result, the Dubins should receive the offset. This claim is unavailing, however.

At trial, and again at sentencing, the Government provided substantial evidence that the purported services were illegitimate: poor record keeping by the Dubins, improper billing based on who performed the services, and services performed by individuals who were not employees at the time they provided services. The Dubins failed to overcome this strong showing and thus fall short of carrying their burden on the first prong. They also failed to prove that Medicaid would have paid for the services because their bills were submitted in violation of Medicaid rules and regulations for psychological treatment and without modifiers for testing administered by psychological

associates, interns, and students (as opposed to licensed psychologists). The evidence of work done by students and unlicensed individuals shows illegitimate services that were billed for reimbursement by PARTS and the Dubins.

2.

Next, we consider the Dubins' challenge to the forfeiture orders: $61,230 for William, and $94,006.64 for David, Dubin. A forfeiture order's legality is reviewed *de novo*; its factual bases for clear error. *United States v. Reed*, 908 F.3d 102, 125 (5th Cir. 2018), *cert. denied* 139 S. Ct. 2655 (2019).

The PSR calculated the total amount of improper benefits conferred on William Dubin from the kickback scheme to be $61,230. For the intended loss related to the health-care fraud perpetrated by William and David Dubin, the PSR found it totaled $659,085.98, of which $282,019.92 was paid to PARTS, because the poor record keeping at PARTS made it impossible to separate legitimate, from illegitimate, Medicaid claims. *See United States v. Hebron*, 684 F.3d 554, 563 (5th Cir. 2012) ("[Defendant] should not reap the benefits of a lower sentence because of his ability to defraud the [G]overnment to such an extent that an accurate loss calculation is not possible."). When the fraud cannot be parsed for properly-obtained amounts, "the burden shifts to . . . defendant to make a showing that particular amounts are legitimate. Otherwise, the district court may reasonably treat the entire claim for benefits as intended loss". *Id.* The loss amount for David Dubin of $94,006.64 was based on his share of PARTS being one-third, and accordingly his share of the impermissible benefit to be one-third. *See Reed*, 908 F.3d at 127 (holding the court must apportion forfeiture amounts between defendants).

The Government demonstrated the Dubins' mutual failures to separate proper payments and valid records from improper payments and

No. 19-50891

invalid records.  After acquiring case-file information, the PSR presented the total amounts to be forfeited by William Dubin and David Dubin, and it bears sufficient indicia of reliability.  *See United States v. Dickerson*, 909 F.3d 118, 130 (5th Cir. 2018).

## D.

The final issue is William Dubin's assertion that the district court erred by failing to adjust his sentence downward based on a lower restitution amount.  A downward sentence, he contends, necessarily flows from his restitution claim:  as a result of his claim that he should receive a vacated or revised restitution amount, his sentence must be lowered according to the newly calculated or vacated restitution.  Because his challenge to the restitution calculation fails, this one does as well.

## III.

For the foregoing reasons, the judgments are AFFIRMED.

No. 19-50891

JENNIFER WALKER ELROD, *Circuit Judge*, concurring:

I concur in the majority opinion's affirmance of David Dubin's identity-theft conviction (Count 25) because our precedent requires it. *See United States v. Mahmood*, 820 F.3d 177, 187–90 (5th Cir. 2016). But I do so reluctantly and write to explain why the Sixth Circuit's decision in *United States v. Medlock*, 792 F.3d 700 (6th Cir. 2015) better interprets the statute at issue, 18 U.S.C. § 1028A.

Title 18 U.S.C. § 1028A is the "Aggravated Identity Theft" statute. That law imposes a mandatory two-year sentence on anyone who uses another person's means of identification without lawful authority during and in relation to theft of government funds. 18 U.S.C. § 1028A(a)(1); *see also Mahmood*, 820 F.3d at 188. In *Mahmood*, we held that § 1028A "plainly criminalizes situations where a defendant gains lawful possession of a person's means of identification but proceeds to use that identification unlawfully and beyond the scope of permission granted." 820 F.3d at 187–88. Hence, under *Mahmood*'s broad language, David Dubin violated § 1028A when he used Patient L's identity to lie about the exact contours of the services provided to Patient L.

But the statute does not require such a broad interpretation, and the Sixth Circuit explained why in *Medlock*. The Medlocks owned a non-emergency ambulance company. 792 F.3d at 703. Medicaid agreed to reimburse the Medlocks for patients' ambulance rides if the rides were "medically necessary." *Id.* Reimbursable transportations had to have an Emergency Medical Technician on board with the patient, and the Medlocks' company had to document each trip with a certification of medical necessity describing why the transportation qualified for reimbursement. *Id.* at 703–04. The Medlocks submitted certificates of medical necessity that contained several lies. For example, the Medlocks lied about patients being

No. 19-50891

transported on stretchers and said that the patients were accompanied by someone inside the ambulance when, in fact, the patient rode alone with the driver. *Id.* at 704, 708.

The Sixth Circuit reversed the identity-theft conviction because the Medlocks "misrepresented *how and why* the beneficiaries were transported, but they did not use those beneficiaries' identities to do so." *Id.* at 707. "[T]he Medlocks' misrepresentation that certain beneficiaries were transported by stretchers does not constitute a 'use' of those beneficiaries' *identification* . . . because their company really did transport them." *Id.* at 708.

In my view, the Sixth Circuit has the better interpretation of the statute.[1] There was simply no identity theft in *Medlock*, and there is none here. David Dubin lied to Medicaid about the exact contours of the services Patient L received, but did not misrepresent that Patient L did indeed receive services. Patient L's not receiving the full array of psychological services does not erase the fact that Patient L—and not someone else—received services. When he billed Medicaid, he lied about when a clinical interview was performed and about the type of person that performed the services. Thus, David lied about *when* and *how* Patient L received services, but did not lie about Patient L's identity or make any misrepresentations involving Patient L's identity. Nor did anyone else pretend to be Patient L. Therefore, any forgery alleged in this case, as in *Medlock*, was related only to the nature of the services, not to the patient's identity.

---

[1] In *United States v. Michael*, Judge Sutton, writing for the panel, favorably cited *Medlock*, which he said "held, quite correctly, that submitting false reimbursement requests about the nature of a service provided did not constitute 'use' of another's 'means of identification' but that forging a doctor's signature to bolster those submissions satisfied the statute." 882 F.3d 624, 628 (6th Cir. 2018). Again, here, as in *Medlock*, the forgery was about the nature of the services provided, not about anyone's identity.

We recently affirmed a § 1028A conviction in a healthcare fraud case where the defendants, unlike in this case, committed actual identity theft. *United States v. Anderson*, 822 Fed. App'x 271, 280 (5th Cir. 2020), *reissued as published on* November 6, 2020.  Terry Anderson owned an optical and hearing aid center at which his son, Rocky Anderson, also worked.  *Id.* at 273.  Terry forged Rocky's signature to file insurance claims, and vice versa.  *Id.* at 280.  The Andersons also used the names of two people to file insurance claims for hearing tests and hearing aids when the people had never been tested by the Andersons and never received hearing aids.  *Id.*  Unlike in this case, there was real identity theft in *Anderson*.

For these reasons, if I were writing on a blank slate, I would follow the Sixth Circuit's interpretation of § 1028A as outlined in *Medlock*.  Because we are bound by the holding in *Mahmood*, however, I concur in full.